MAMIE BEATTY, DEPENDENT, RESPONDENT, v. CHANDEYSSON ELECTRIC COMPANY, EMPLOYER, APPELLANT.—190 S. W. (2d) 648.

St. Louis Court of Appeals. Opinion filed November 20, 1945.

*Edw. C. Friedewald* for employer, appellant.

870

*Abeken & Bergmann* and *H. P. Tudor* for respondent.

McCULLEN, J.—This is an appeal from a judgment of the Circuit Court of the City of St. Louis, Missouri, affirming an award of the Workmen's Compensation Commission in favor of respondent, the dependent widow of a deceased employee of appellant. The proceeding was first instituted by Renie Beatty who had been an employee of appellant. In his claim for compensation filed with the Commission on July 20, 1943, the employee alleged that on August 15, 1942, while at work on a bench drill the bench vise which was holding some metal parts slipped, causing him to fall backwards, and that several of the metal parts fell on him bruising and injuring his male organs and causing cancer of said organs. On September 26, 1943, before the claim was heard by the Commission, said employee died, and thereafter, on October 10, 1943, a new claim was filed by Mamie Beatty, respondent herein, containing the same allegations as those filed by the deceased employee, except that respondent asked for the death benefit for the employee's death.

Although respondent was joined in her death claim by James Dale Strong, her son by a former marriage, the Commission found that he was not a dependent. Therefore he need not further be considered herein.

In its answer to the claim the employer stated that the filing of the claim by the employee on July 20, 1943, "was the first knowledge the employer had that the employee claimed to have suffered an injury to his private organs while in their employment on August 15, 1942," and that, "this notice coming more than eleven months after the alleged accident and after the employee had undergone several operations, prevented the employer from making proper investigation into the circumstances alleged by the employee and his dependents to be the cause of the employee's death." The employer asked that the claim be dismissed for failure to give the proper notice, as required by law. It also denied each and every other allegation in the claim.

On June 6, 1944, the matter was heard before a referee of the Compensation Commission who made an award allowing the claim. Thereafter a review of said award was duly had before the full Compensation Commission and, on November 3, 1944, the Commission made a final award together with findings of fact. The full Commission allowed to respondent a death benefit of 300 weeks at $16.03 per week, $150 for burial expenses, and $185 for medical expenses to Dr. Edwin C. Ernst. Thereafter, on appeal to the Circuit Court of the City of St. Louis by the employer, the award of the Commission was affirmed and the appeal to this court followed in due course.

Appellant contends that the Compensation Commission was without jurisdiction because claimant offered no evidence to show that the employee notified his employer of having·suffered any injury, as alleged in the claim, within the time required by Section 3726, Revised Statutes Missouri 1939; and that she also failed to offer any evidence to show good ·cause for failure to give such notice; and offered no evidence to show that the failure to give such notice was ·not prejudicial to the employer's interest.

The employer further contends that the finding and award of the Compensation Commission, that the cancer which caused the death of the employee was the result of the injuries, is not supported by sufficient competent evidence and is pure speculation. These points raised·by appellant require a review of the evidence.

The deposition of Renie Beatty, the deceased employee, which was taken on August 23, 1943, a little more - than a month before his death, was read in evidence on behalf of claimant. The employee testified that during the week of August 15, 1942, he was working at a bench in the employer's shop drilling holes in some bronze metal yokes for large generators; that while he was screwing one of the yokes in a vise, the vise slipped and caused him to fall backwards and to strike his back on an open drawer where he kept his tools; that to keep himself from falling he grabbed hold of some of the yokes that were lying on the bench where he was working and pulled them down on top of him; that the yokes weighed approximately fifteen · or sixteen pounds and were about eleven inches in width and slightly more in length and had prongs on each end; that the metal yokes "fell right here in my groin, mashed my penis, also my glands, bruised them up. I had a cut in my back about that long (indicating), about like that, about an inch and a half."

"Q. These yokes falling on your penis—your testicles, is that what you mean by your glands? A. That's right.

"Q. Did you suffer any pain? A. I suffered severe pain before I could get to the first aid man to get my back dressed.

"Q. Were you able to get up immediately? A. I got up and crawled—walked over to the drill press and sat down on the stool I had there."

The employee further testified that it was about fifteen minutes before he was able to go to the first aid man, a Mr. Leonard who was also the foreman, and have his back treated; that he did not mention anything about injury to his groin or glands to the first aid man; that the first aid man dressed the cut on his back. At this point the employee testified:

"Q. Did you say anything to him about your getting hurt? A. He dressed my back and told me he wanted to see me the next morning, and I wasn't hurting so bad when I went out of his office, and I never mentioned the others.

"Q. Did you tell him what happened, how you had been cut or how you had fallen? A. I did.

"Q. And he dressed the cut in your back? A. He did.

"Q. Did he do anything else besides that? A. That's all.

"Q. Did you mention to him the pain you had in your testicles and penis? A. I never mentioned it to him at the time.

"Q. Had that subsided by that time? A. It had."

The employee further testified that he returned to Leonard, the first aid man, the next day for another dressing of his back; that Leonard asked him if he wanted to go to another doctor; that he told Leonard he would leave that to him—that if Leonard thought it was necessary he would go to another doctor, but that Leonard said he didn't think it was; that a few minutes after the accident Mr. Chandeysson, president of the employer company, came through the shop; that Chandeysson asked him if he wanted to go to a doctor and he told Chandeysson he didn't think it was necessary—that Mr. Leonard had taken care of him; that he did not tell Chandeysson about the pain. The employee further testified in his deposition that he continued to work regularly every day for the employer until some time in November, 1942, at which time he suffered pain and slight hemorrhages of the penis; that about October 15, 1942, he went to Dr. Clyde E. Kane, his family doctor, for an examination. Dr. Kane treated the employee for what the doctor believed to be a chancre and, getting no favorable response to such treatment, sent the employee to Doctors Roberts and Ives who made a biopsy of the affected part and, on January 4, 1943, made a report showing that the part from which the biopsy had been taken was affected by cancer. Shortly thereafter, in January, 1943, the employee told Mr. Chandeysson, the employer, who is also a graduate medical doctor, that he had a cancer. The employer sent the employee to Dr. William E. Leighton, who was Chandeysson's doctor—Chandeysson telling the employee that he would not take one doctor's word for it as it was a serious matter and that the employee should see another doctor. At this point in his testimony the employee was asked: "Now, did you say anything to Mr. Chandeysson at that time about having an accident in August, 1942?", and answered: "No, sir." The employee further testified that Chandeysson told him not to say one word to Dr. Leighton, but to just answer his questions.

It appears from the evidence that later the employee entered the Barnard Free Skin and Cancer Hospital and was operated on several times and that the involved private parts were cut out. The employee testified that he had two scars on his body as the result of the accident, saying:

"A. I have one here in the left gland that's the picture of a 'V', and one on my back, I couldn't tell you, I can't see that.

"Q. The one on your gland, where is that? Right here on this side of the hip—it is about 3/4 inch—just across from my penis— that was caused where the corner of the yoke hit me."

The employee further testified that he finally was compelled to quit work in January, 1943, and that he lost a lot of time from his work on account of his injuries.

Dr. Clyde E. Kane testified on behalf of claimant that when he first saw the employee in October, 1942, the employee told him he had injured his testicles and groin while at work. The doctor also testified that he noticed a small scar on the employee's left leg in the region of the scrotum; that the employee was suffering from a lesion on the top part of his penis which the doctor diagnosed as a soft chancre; that it did not have the appearance of a hard chancre or syphilis, but that he made two or three blood tests which ruled out the possibility of lues; that when the lesion did not respond to treatment he advised a biopsy, which was made by Doctors Roberts and Ives, whose report showed: "squamous cell carcinoma." The doctor further testified that he treated the employee from the time of his first visit until shortly before his death with the exception of the time the employee was a patient in the Barnard Free Skin and Cancer Hospital; that shortly before his death the employee was cancerous all the way from his knees to the umbilicus; that he had made at least three blood tests of the employee and could definitely say there were no lues or syphilis present, nor was there any evidence of venereal disease, and that he found no infection. In answer to a question as to whether the trauma caused by the injury could have caused the cancer, the doctor answered that it could have been a factor in producing the cancer which caused the employee's death. The doctor stated that the medical profession as a whole thinks trauma and infection may be a factor in producing cancer. In this connection the doctor testified:

"Q. Assuming the facts, Doctor, I have just given you in the previous question, and assuming there was some tissue of inherent nature that might some day be caused to be cancerous in Mr. Beatty's body, would you say these parts falling on his male organs, would that activate or accelerate this cancer? A. Oh, yes."

Dr. Kane testified that the progress of the cancer, from the time he first saw the employee until his death, had been unusually rapid; that he could not tell how old the lesion was when he first saw it.

The employer introduced records of the Barnard Free Skin and Cancer Hospital, part of which purported to be a history given by the employee upon his entrance to said hospital. These records were introduced over the objection of claimant to show that the employee, prior to the time of the accident on August 15, 1942, had suffered from various diseases of his private organs. No one from said hospital

identified said records, nor did it appear from the testimony of any witness who were the persons who made the records.

Dr. F. G. Pernoud testified on behalf of the employer of having treated the deceased for a venereal infection in November and December, 1941, which had not been cured when he last saw him.

Dr. William E. Leighton testified on behalf of the employer that he saw the deceased in January, 1943, and that the deceased gave him a history that he had a sore on his penis since January, 1942, and in the course of the year had been treated by a doctor and that the lesion did not respond to treatment; that he, the employee, had been circumcised, but that didn't help and a biopsy was done and submitted to Dr. Ives for an examination. The witness further testified that the employee exposed himself and showed a destructive lesion of the gland penis; that it was practically destroyed, and that the witness told him that without any question, "I felt he had cancer." The doctor was asked a hypothetical question embodying the facts of the accident of August 15, 1942, and stated:

"A. In answer to the hypothetical question, the extension of the growth was much greater than I would expect, in a period of four months or five months, following injury.

"The Referee: And that therefore you concluded what?

"A. I do not believe that the injury, the cancer, was the result of an injury, after an injury.

"Q. Would you say it would have been impossible for it to have been the result of that injury? ·

"A. I would rather question—I do not think anyone could make a positive statement but I would rather doubt it would develop from that.

"Q. You say it is possible but you would rather doubt it did develop from that injury—is that your answer?

"A. From that injury."

The doctor was further questioned as to the possibility of cancer being the result of the injury sustained on August 15, 1942, and finally testified that he did not believe it possible, and his medical opinion was: "No, sir."

On cross-examination in his deposition the employee denied that he had gonorrhea in 1932; denied that he had a discharge from his penis at that time; denied that he had a reddened area or chancre on his penis in February, 1942; denied that he was treated by a doctor in February, 1942, or had any shots in the arm or took any tablets at that time for venereal disease; denied that he had made any statements at the Barnard Free Skin and Cancer Hospital concerning any venereal disease or treatments therefor; denied that he had made any statement at said hospital that he had fallen in a muddy boat and severely bruised the end of his penis, or that any such occurrence had happened; and denied that he had had any

trouble with his penis or private organs at any time prior to August, 1942. He further testified that at various times he had had four blood tests made and that all had shown negative.

Mamie Beatty, respondent herein, testified in her own behalf that she married the deceased on December 12, 1941, and had lived with him from that date until the time he died on September 26, 1943, with the exception of the time he was in the hospital; that, from her close and intimate personal association with and observation of him during the time they lived together, he was not suffering from any venereal disease of any kind. Respondent went into the most intimate details in her testimony concerning her marital relations with the deceased, but we deem it unnecessary to set forth such testimony here. Respondent further testified that when the deceased came home on the night of August 15, 1942, she noticed that his back had been treated and she also noticed that there was a "V"-shaped scar on his left leg; that he seemed to be in discomfort, and that he was "up and down during the night."

It is established law in this State that findings of fact by the Workmen's Compensation Commission are in the nature of a special verdict and are conclusive if supported by any substantial competent evidence. [Leilach v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601.] The law is also well settled to the effect that the Court of Appeals must view the evidence in a Workmen's Compensation case in the light most favorable to support the award of the Workmen's Compensation Commission, and must draw all reasonable favorable inferences therefrom to support such findings. [Buckner v. Quick Seal, Inc., 233 Mo. App. 273, 118 S. W. (2d) 100, and cases therein cited.]

Another rule applicable to this kind of a case is that where the Compensation Commission makes a general finding in favor of a claimant and makes an award of compensation thereon, the general finding necessarily implies a finding of every fact necessary to support the general finding. [Buckner v. Quick Seal, Inc., *supra*, and State ex rel. Buttiger v. Haid, 330 Mo. 1030, 51 S. W. (2d) 1008.]

Appellant strongly urges that the Commission was without jurisdiction because the claimant failed to show that she had complied with Section 3726, Revised Statutes Missouri 1939, in that she offered no evidence that the employee notified his employer, within the time provided by said section, of having suffered any injury as alleged in his claim. Said section provides:

"No proceedings for compensation under this chapter shall be maintained unless written notice of the time, place and nature of the injury, and the name and address of the person injured, shall have been given to the employer *as soon as practicable* after the happening thereof but not later than thirty days after the accident, *unless the commission shall find that there was good cause for failure to give*

*such notice, or that the employer was not prejudiced by failure to receive such notice.* . No defect or inaccuracy in such notice shall invalidate the same unless the commission shall find that the employer was in fact misled and prejudiced thereby." [Section 3726, R. S. Mo. 1939, Mo. R. S. A., sec. 3726.] (Emphasis ours.)

We think that the evidence herein shows clearly that this case comes within that portion of the statute which we have underlined above.

Appellant did not call its president, Dr. Chandeysson, or its foreman Leonard, or any other witness, to testify concerning the facts surrounding the accident, or to show in what manner appellant was prejudiced by reason of the fact that it did not receive the notice in writing provided for in the statute, Section 3726, *supra*. From the failure of appellant to produce any such testimony an inference is authorized that such testimony would have been. unfavorable to the employer on that issue. [Alexander v. St. Louis-San Francisco R. Co., 327 Mo. 1012, 38 S. W. (2d) 1023, 1028.] Furthermore, the language of the statute itself clearly shows that the written notice mentioned therein is not an absolute unconditional prerequisite to recovery in a compensation case, and the failure to give such written notice may be excused if the Commission finds that there was good cause for failure to give the notice, or that the failure to give it did not prejudice the employer. [Newman v. Rice-Stix Dry Goods Co., 335 Mo. 572, 73 S. W. (2d) 264.]

We are of the opinion that there was substantial evidence from which the Commission could properly find that there was "good cause" for the employee's failure to give the written notice in that he did not know that he had the cancer, which later caused his death, when he told the employer of the accident whereby he was injured, and no evidence whatsoever was introduced by appellant to show wherein it was prejudiced by the lack of a written notice.

By its general finding in favor of the claimant, and its award of compensation, the Commission necessarily found, either that there was "good cause" for the failure of the employee to give notice of the cancerous condition caused by his injury, in that he did not know of that condition until January, 1943, at which time he told Chandeysson about it, or that, inasmuch as appellant had ample opportunity at any time from a few minutes after the accident to make any examination of the employee which it believes to be necessary, it suffered no prejudice by the employee's failure to give the notice in writing. [Buckner v. Quick Seal, Inc., 233 Mo. App. 273, 118 S. W. (2d) 100; State ex rel. Buttiger v. Haid et al., 330 Mo. 1030, 51 S. W. (2d) 1008; Reeves v. Fraser-Brace Engineering Co. (Mo. App.), 172 S. W. (2d) 274.]

There was no duty upon respondent herself to give notice of her claim until after the employee's death. Her claim, of course, did not arise until the employee died. Since there was no showing that

had written notice been given immediately after the accident appellant could have obtained evidence relating to the accident and injury in addition to that produced at the hearing, the failure to give the written notice within the time required by the statute did not preclude recovery of compensation. [Reeves v. Fraser-Brace Engineering Co. (Mo.), 172 S. W. (2d) 274.]

Appellant, in its argument to show how it was prejudiced by not receiving such notice, says it offered medical aid on the very day of the accident which was refused by the employee. This contention is not supported by the record. The record shows that the employee, after telling Leonard, the first aid man, "what happened," and "how he had been cut," and "how he had fallen," told Leonard that he would leave it to him as to whether he (the employee) should go to a doctor, and that Leonard said he did not think it was necessary. There was nothing to prevent Leonard, as the representative of appellant, from having an examination made of the employee right at that time. Appellant, through Leonard, having been informed of the manner in which the metal yokes had fallen on the employee, could easily have had an examination made of the employee at that time to ascertain, if desired, the full extent of the employee's injuries, but the first aid man decided such examination was not necessary.

The appellant had knowledge of all the facts pertaining to the manner in which the employee sustained his injuries but chose to do nothing further about it, and ought not to be heard, at this late day, to complain that the employee did not at that time go into full details as to the extent of the injuries he received.

The fundamental purpose of the Legislature in enacting the Workmen's Compensation Law was, as a matter of public welfare, to place upon industry the losses sustained by workmen and their dependents by reason of injuries and death arising out of and in the course of employment—the theory being that compensation for such losses should be paid by industry rather than to leave the injured employee or his dependents to bear such loss alone. [See 71 C. J., sec. 15, page 242 et seq.]

The notice section of the Act, Section 3726, *supra*, relied on by appellant herein, was intended to prevent the employer from being imposed upon by stale or fraudulent claims. However, the very exceptions to the requirement of notice to the employer within thirty days, as set forth in Section 3726, *supra*, itself, show that said section was not intended to be used as a technical legal trap to defeat claims because of failure to give such notice where the evidence shows that such failure was based upon "good cause," or that the employer suffered no prejudice by the failure to receive such notice.

In the case at bar, the construction of Section 3726, *supra*, contended for by appellant, if upheld, would be in conflict with the express provisions of Section 3764, Revised Statutes Missouri 1939

(Mo. R. S. A., Sec. 3764), which provide that all the provisions of the Workmen's Compensation Law "shall be liberally construed with a view to the public welfare. . . . " Our courts have held, in applying the liberal construction rule stated in Section 3764, *supra,* that a doubt as to the right of compensation should be resolved in favor of the claimant. [Bicanic v. Kroger Grocery & Baking Co. (Mo. App.), 83 S. W. (2d) 917, 923, and cases cited therein. See also, State ex rel. Kroger Grocery & Baking Co. v. Hostetter, 339 Mo. 630, 98 S. W. (2d) 683.] We rule this point as to notice against appellant.

We are unable to agree with appellant's contention that the Circuit Court erred in affirming the finding and award of the Commission, that the cancer which caused the employee's death was the result of the injuries, because, as appellant asserts, such conclusion is not supported by sufficient competent evidence and is pure speculation.

The evidence shows that the employee gave oral notice of the accident to both Mr. Leonard, the first aid man of the employer, and to Dr. Chandeysson, the employer himself. There is nothing whatsoever to show that the employee knew at that time that he was suffering from cancer. The evidence further shows that the first time the employee knew he was suffering from cancer was on January 4, 1943, and this was immediately reported by him to Dr. Chandeysson. The history in the records of the Barnard Free Skin and Cancer Hospital, purporting to show statements by the employee as to his suffering from venereal disease prior to August 15, 1942, as well as the medical testimony adduced on behalf of appellant to show the employee's said purported diseased condition, were all emphatically and unequivocally denied by the employee in his deposition given in August, 1943, shortly before his death. This evidence *pro* and *con* with respect to the employee's condition prior to the date of his injury on August 15, 1942, merely constitutes a conflict in the evidence which we must resolve in favor of the findings and award made by the Commission. Furthermore, there is the positive testimony of Dr. Kane in behalf of respondent to the effect that the employee gave him the history of the accident sustained on August 15, 1942, and that the doctor saw the small "V"-shaped scar on the employee's left leg which the employee told him had been caused by the falling of the metal yokes on him.

Also supporting the findings of the Commission is the further testimony of Dr. Kane to the effect that the trauma sustained by the employee on August 15, 1942, could have been a factor in causing the cancer, and that in the event there was tissue of an inherent nature that might be caused to become cancerous in the employee's body, the injury to his male organs sustained by the employee on

August 15, 1942, would activate or accelerate the growth of such cancerous tissue and thus cause the cancer from which he died.

It is unnecessary to discuss in detail the medical testimony adduced on behalf of appellant because we are not authorized, in a Workmen's Compensation case, to weigh the evidence, whether it be opinion or fact evidence. The medical testimony adduced by appellant, as against the substantial testimony adduced by respondent, merely presents a conflict which we must resolve in favor of the evidence which supports the findings and award of the Commission. We have set out the testimony rather fully and it is unnecessary to repeat it here. It is sufficient to say that we find from the record that there was ample substantial evidence to support the findings of the Commission that the accident sustained by the employee on August 15, 1942, ''resulted in injuries which developed into cancer, causing his death.''

Appellant contends that the Commission was not authorized to charge it with $185 for medical expenses incurred by the employee in selecting his own doctor at a time when appellant was not aware that a claim for injuries was being made against it. After the claim for compensation had been filed by the employee on July 20, 1943, appellant, by its answer thereto, denied each and every allegation contained therein, and took the position that it was not liable for the injury and death of the employee. This position necessarily meant also that it denied liability for medical aid to the employee.

The record shows, without dispute, that the employee received heat and X-ray treatments from Dr. Ernst from January 12, 1943, to March 17, 1943. Inasmuch as the employee did not know at that time that he had suffered an injury for which he would be entitled to compensation, the fact that he contracted for such medical services without appellant's knowledge does not relieve appellant from the obligation of liability for the necessary medical expenditures. [Reeves v. Fraser-Brace Engineering Co., *supra.*]

Since we are holding that there was ample evidence to support the award of compensation, it necessarily follows that the award for medical services must also be sustained.

The judgment of the Circuit Court affirming the findings and award of the Compensation Commission is affirmed. *Hughes, P. J.,* and *Anderson, J.,* concur.