250 S.W.2d 803 (1952)
BROWN
v.
GRIESEDIECK WESTERN BREWING CO. OF MISSOURI et al.
No. 28325.
St. Louis Court of Appeals, Missouri.
July 1, 1952.
Rehearing Denied September 5, 1952.
*804 John S. Marsalek, Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, for appellants.
Harry J. Stadin, Courtney S. Goodman, St. Louis, for respondent.
HOUSER, Commissioner.
In a proceeding filed under the Workmen's Compensation Law a referee of the division of workmen's compensation found in favor of Mark Brown, employee, and against Griesedieck Western Brewing Company of Missouri, employer. On review the industrial commission reversed the referee's award and found in favor of the employer. On appeal the circuit court reversed and set aside the final award of the industrial commission denying compensation. From the judgment of the circuit court the employer and insurer have appealed to this court.
The claim and answer filed with the division raised the issue whether the employee while making a delivery for the employer on September 3, 1948 fell over a bookcase, thereby injuring his right leg, hip and back, it being the contention of employer and insurer that claimant at no time suffered any injury or disability arising out of or in the course of his employment. The ultimate issue was whether a hip fracture sustained by Mark Brown was a pathological fracture due to bone disintegration caused by disease or whether it was a fracture sustained as a result of the fall described by the employee.
At the hearing claimant testified that on September 3, 1948 while delivering case beer for his employer at Woodruff Drug Company in the City of St. Louis he bumped against a bookstand, lost his grip on the hand truck he was pushing, knocked the bookstand over and fell on top of it, his whole right side striking the bookstand; that he received a few scratches on his right side, shoulder and neck but continued on his route, completed his work for the day, reported the occurrence to his boss; that although he noticed no trouble with his right side, leg or hip on that day immediately after the occurrence he began to stiffen up a bit on his right side that night, not enough to "stop him", but that he didn't move around as freely as he did ordinarily; that on the next day, September 4, he returned to work, starting at 8:15 a.m., and that at about 2 p.m. he was at Koch Tavern at 2225 Pestalozzi Street; that while in the act of picking up a case of beer to carry it from the left to the right-hand side of his truck he bent over, took hold of the case with both hands in the grip holes, and had just lifted the case off the floor when he felt a snapping or popping in his right side or leg; that his leg "felt funny"; that the snap began at his knee and went to his hip. It seemed like his leg drew up and cramped his hip. He didn't stumble, trip, slip or fall. He could not get his right foot to the floor, became very sick and was unable to continue his work for more than 45 minutes. He was unable to walk. He returned the truck to the garage, reported to the employer's dispatcher that he had hurt himself, and went home, where Dr. Francis J. Medler saw him that evening. On the following Tuesday Dr. Medler made an X-ray of claimant's leg, told him to go home, stay off of it and not to walk on it. Claimant remained at his home for approximately 5 weeks, during which period he visited the doctor once a week. A second X-ray was then taken, in which the doctor discovered a fracture, whereupon he made arrangements for claimant to enter St. Mary's Hospital as a patient of Dr. E. C. Funsch. Claimant spent 11 days in that hospital under the care of Dr. Funsch and the resident surgeon Dr. O'Reilly, during which time X-rays were taken. Claimant was placed in a plaster cast. Thereafter Dr. Funsch did not continue to treat him. For an 8-week period while he was at home in bed claimant was visited by Dr. Medler twice a week. Claimant was in City Hospital from December 3, 1948 to February 15, 1949 and on various occasions thereafter. In all he was placed in a cast 3 times and at the time of the hearing his hip was stiff in all directions, his right leg *805 was 2 inches shorter than the left, and he was completely disabled for hard, manual work.
It was claimant's theory that he suffered a fracture of the neck of his right femur when he fell over the bookcase; that it was an impacted fracture; that the broken parts held together until the incident which occurred on September 4.
Claimant's doctor, Edward C. Holscher, examined claimant on October 10, 1949. He also examined numerous X-ray plates taken at the hospitals. It was his opinion that the fracture was caused by the fall over the bookstand; that it was an obvious impacted fracture at the base of the neck of the femur which was driven down into the superstructure of the trochanter a distance of about an inch; that the fragments were enmeshed together so that there was relatively little if any motion between the fragments; that it is possible for a person to have one bone driven into another a distance of an inch and practically feel no effect, just like nothing happened, and that he would not have shock or pain, or very mild pain, because the damage is within the cancellous or spongy type of bone, away from any nerve site; that if the fracture were one in which the fragments came apart the individual would probably be incapacitated, could not get up and bear his weight on the extremity and there would be pain, but if it were an impacted fracture with the fragments jammed together and enmeshed so that there was very little motion between the fragments "then the person could have a very vague type of disturbance; it might even feel like a bruise or some stiffness in the hip and (he) could get up and bear weight on it because the fragments are enmeshed together and stabilized together, and go on his way"; that a man could sustain such a fracture in such a fall without knowing about it; that the impacted fragments can be unrecognized by the patient and often by the doctor; that the patient could go on indefinitely through to a complete healing; that in an impacted fracture of this type the fragments can later get loose and cause an upset of symptoms, as presented here in this case; that the accumulated weight stress through the region resulting from stooping, bending and twisting his hip and lifting up of the case of beer (and presumably others) caused the firmly impacted fractures to come partially apart and become free; that when the "popping sensation" occurred the impaction became loosened, but the "thing that appears to have pulled apart here is the manipulation at St. Mary's Hospital when they attempted to correct the alignment." He ruled out the possibility of pathological fracture due to syphilis, stating that the hip joint looked perfectly normal. He saw no evidence of any reaction of the bones at any place "nothing cystic there"saw no evidence of any syphilitic lesion in the bone or manifestation whatever in the X-rays or of any pathology in or about the site of the fracture. He denied that a case of syphilis such as claimant had could produce a condition in and about the neck of the femur so that it would ultimately break and stated that in his opinion the injection treatment for syphilis had no causal connection with the fracture; that in a late stage of syphilis where the bones are affected they become inflamed, get thick, brittle, dense in appearance, and that there might be pain or limited motion; that the hip joint is not very often involved in syphilis and that the hip joint in this case shows no evidence that there has been a process of that nature; that when syphilis in the central nervous system affects the joints it is known as "Charcot's" disease, a characteristic picture of disintegration of bone immediately beneath the joint, which is easily ascertained in X-rays; that it "looks like a clean cut fracture and no evidence that it has occurred from any disease process within that bone or bony structure at the hip."
Richard L. Ravenstein, manager of the drug company, recalled the incident of the driver knocking down a bookstand while delivering beer, heard a noise, saw the bookstand and books lying on the floor, identified his initials on the delivery ticket showing that on August 9, 1948 a driver by the name of Brown delivered some beer and that Ravenstein receipted for the beer. He testified that the driver said he was *806 not hurt; that there was a scratch on his arm; that when the driver finished his delivery he walked out and was not limping.
It was the theory of employer and insurer that no such occurrence as that described by claimant took place on September 3, 1948; that the only time claimant made a delivery to Woodruff Drug Company was on August 9, 1948; that he sustained no injury at that time; that the fracture occurred on September 4, 1948 as a result of the disintegration of the bony structure of the hip due to a syphilitic condition and that it would have been a physical impossibility for claimant to continue to work from August 9 to September 4, 1948 with an impacted fracture of the femur. In support of this theory the following documents were produced: The company's ledger sheet showing all deliveries made to the drug company; all receipts for deliveries to that company during the period August 9 to September 3, 1948 and all delivery tickets signed with the name "Brown" as driver dated September 3, 1948. The only slip showing delivery to Woodruff Drug Company bearing the signature "Brown" was dated August 9, 1948. When confronted with this slip claimant denied that the signature was his own; stated that at that time there were two Browns working for employer and that he put "M" Brown on all his tickets. The two slips showing deliveries to Woodruff Drug Company on September 3, 1948, the date claimant testified he fell at the store, were signed by driver Ray Deckman and driver Melvern Capstick. The delivery slips dated September 3, 1948 signed "Brown" were all for deliveries in South St. Louis, far removed from the vicinity where the Woodruff Drug Company is located. Thereupon, stating that claimant could be mistaken about it, counsel for claimant by leave amended the claim by changing the date of the accident pleaded as September 3, 1948 to "on or about August 9, 1948 or September 3, 1948."
Robert Clement Brown testified that there were no other drivers named Brown in the employ of the company other than himself and claimant at that time; that he did not recall making a delivery at Woodruff Drug Company at any time; that he did not go to Woodruff Drug Company on August 9, 1948; that the ticket dated August 9, 1948 signed "Brown" did not bear his signature; that he signed his initials "R.C. B." on the delivery tickets and never signed his tickets "Brown".
Harold R. Larkin, a representative of the insurance company, testified that he took a signed statement from claimant on October 14, 1948 at St. Mary's Hospital in which claimant related in detail the occurrences of September 4, 1948 while making a delivery at Koch Tavern at 2225 Pestalozzi Street but made no mention of any accident or injury occurring at Woodruff Drug Company at any time and that claimant told Larkin he had had no previous trouble.
Edmund J. Barker, another representative of the insurance company, testified that on October 25, 1948 he went to claimant's residence with a shorthand reporter who recorded questions and answers which were later transcribed, in which claimant related the facts surrounding the incident on September 4, 1948 at Koch Tavern and stated that was the first time anything like that ever happened; that after the occurrence there was no pain whatsoever.
The records of both St. Mary's and City Hospitals record a simple fracture of the neck of the femur on the right side, and neither record any evidence of a syphilitic lesion. The resident physician at St. Mary's entered the following in the diagnosis: "X-rays show fracture of base of neck of right femur with no evidence of cyst formation." In the City Hospital record the following entry appears: "There is no definite evidence to show that this is a pathologic fracture." The facts recorded in the histories given at both hospitals recite the occurrence on September 4, 1948 when claimant lifted a beer case at Koch Tavern, and at no place refer to a fall over a bookcase at Woodruff Drug Company or elsewhere. It also appeared in the history that 20 years ago claimant had a "Neisserian infection discharge & dysuria. Denies sores."During cross-examination claimant admitted that for a year prior to June, 1948 when he entered the employ of the brewing company *807 claimant had been under medical treatment for syphilis. Dr. Medler was giving him two shots a week in his right hip and some shots in the left hip for this condition.
Dr. E. C. Funsch, testifying for employer and insurer, stated that claimant related the occurrences of September 4, 1948 when lifting a case of beer, and that although questioned at length he made no complaint of any pain or difficulty with his hip prior to that date; that at the request of Dr. Medler he made the arrangements for the admission of claimant to St. Mary's Hospital on October 6, 1948; that he examined him and an X-ray was taken on that day which revealed a fracture at the base of the right femur; that the head and neck of the femur were separated from the main shaft of the bone; that there was an upper displacement, i. e. the shaft of the femur was pushed up 3 centimeters, or a little over an inch; that the first X-ray showed some absorption around the end of the broken bone and some fluid or calcium deposit; that the fracture was reduced, a cast applied and a second X-ray showed that the fragments were in good position; that laboratory tests taken revealed that claimant had syphilis of the central nervous system, of the brain and cord. He testified that the X-rays at St. Mary's Hospital revealed a mere fracture and disclosed nothing with respect to the condition of the bones in the region of the right hip, nothing in the texture of the bone that looked abnormal; that calcium deposit was to be expected; that claimant left the hospital on October 15, 1948. Claimant at no time related to Dr. Funsch any accident other than that of September 4, 1948 "everything dated from September 4." He made no complaint of any pain or difficulty with the hip prior to that time and told the doctor he had been doing his regular work. The doctor's diagnosis was pathological fracture of the neck of his femur caused by syphilis. He knew of no other condition in which you can have a fracture of a joint without pain except central nervous system syphilis. Claimant had no pain when it happened and had no pain during the examination. Claimant told him that the sensation he had was a slipping and a shortening of the leg. The doctor stated that a pathological fracture is one where the bone breaks because of disintegration; that it can break either from the force of gravity or from the force of a muscle pull; that while pathological fractures resulting from disintegration of bone due to syphilis are not very frequent, he had encountered cases of that kind in his practice; that unpainful fracture with central nervous system lues is a leading symptom of pathological fracture. In answer to a hypothetical question Dr. Funsch testified that it was his impression that the fracture of the hip occurred on September 4, 1948 when he attempted to lift the box of beer; that the lifting of the box of beer was the "straw that broke the camel's back", i. e. that there had been some changes of bone and by reason of this weight and his changed position the neck of the femur broke. After examining the X-ray taken October 6 the doctor was asked if there was any evidence of an impacted fracture of the neck of the femur being driven into the shaft of the femur and he answered "No, there is no impaction here. This fragment is free and the femur is rotated." He further stated that the second X-ray taken October 11 "shows no impaction, just the contrary, that there is some separation there." He admitted that "some doctors might call it an impaction." It was the opinion of the doctor that if he had sustained an impacted fracture he "would have felt the giving way of the bone, there would have been some shortening of the limb, and, ordinarily, the man would feel pain except that he had syphilis and he probably wouldn't feel any pain with that"; that with an impacted fracture his leg would not sustain his weight, he would not be up and around handling beer cases but would be lying in bed; that a man who sustained an impacted fracture of the neck of the femur moved an inch out of position could not perform the work of a beer driver from August 9, 1948 to September 4, 1948, driving, getting in and out of a truck, handling, loading and delivering cases of beer, that it would be physically impossible to perform that kind of work for that period of time under those conditions; that "he couldn't stand the activity of even getting on and off the truck besides the lifting"; that an impacted fracture *808 of the hip would evidence itself by a shortening of the limb; that if the fracture had occurred on August 9 he would have known it the same as he did on September 4. An X-ray taken November 3, 1949 at City Hospital showing that a reconstruction type of operation had been performed revealed some broken pieces. Dr. Funsch stated that apparently during this operation some of the bone was broken; that "it is characteristic of a lack of blood supply to that particular part"; that one of the causes for lack of blood supply is certain types of syphilis, as well as arteriosclerosis, chronic alcoholism, etc.; that except for the first X-ray the others show broken bones and a degeneration that "could easily come from syphilis"; that the head of the femur is disappearing and looks like it is dissolving, a condition associated with the lack of blood supply. He stated that claimant did not have Charcot's disease, which is a destruction of a joint surface because of syphilis and a breaking down of the bone. He further stated that there was no cyst formation in the area of the hip, no gumma or syphilitic lesions that he could detect from the physical findings; that if he had found such a lesion he would have been "confirmed in his diagnosisit would be more symptomatic." He admitted that the diagnosis did not show pathological fracture due to syphilis, and that tumors, tuberculosis, tropical diseases, anything that will interfere with blood supply, may cause a pathological fracture.
The referee found that Mark Brown on August 9, 1948 sustained a fall while wheeling a hand truck delivering beer to Woodruff Drug Company, and resolved the facts in the case "in favor of the employee in relation to the resulting injuries he has sustained due to the testimony given by Dr. E. C. Holscher, a witness for employee, who testified that this type of impaction fracture of employee's right hip could have gone on indefinitely, even through the full course of the healing period, without employee knowing he had a fracture." On review the commission reversed the referee's award, denied compensation and found that "the condition complained of by Mark Brown, employee herein, was neither caused nor aggravated by an accident of August 9, 1948, arising out of and in the course of his employment with the Griesedieck Western Brewing Company of Missouri, as alleged. We further find that the disability suffered by said employee on September 4, 1948, was not the result of an accident arising out of and in the course of his employment * *."
The first point for decision is whether the final award of the industrial commission is supported by competent and substantial evidence upon the whole record and whether it was contrary to the overwhelming weight of the evidence. That it is so supported amply appears from the evidence that the only time claimant made a delivery of beer at Woodruff Drug Company was on August 9, 1948; that he sustained some scratches at that time; that he was suffering from syphilis for which he had been under medical treatment for a year prior to the accident; that he had had syphilis 20 years before that time; that when he lifted the case of beer on September 4, 1948 he suffered a pathological fracture of the neck of the femur due to the degeneration of the bone which occurred as a result of the syphilitic condition; that it was not an impacted fracture; that between August 9 and September 4, 1948 he continued work as usual as a truck driver, delivering heavy cases of beer daily, driving the truck, climbing on and off the truck, lifting, trucking and delivering cases of beer; that it would have been impossible to continue in the performance of this heavy work with an impacted fracture of the hip.
The commission may very well have discounted claimant's testimony after taking into consideration his two incongruous versions of the period of time which elapsed between the incident at Woodruff Drug Company and the incident at Koch Tavern. In relating the history of the case to the several doctors, to the hospital attaches, in his written statement, and in filing his claim and testifying on direct examination before the referee, claimant fixed the date of the accident as September 3 or 4, 1948. In relating the facts to Dr. Funsch, the two insurance company representatives, and the hospital attaches claimant relied on the incident at Koch Tavern when he lifted the *809 beer case, twisted and felt the "popping" sensation. He signed a statement in which he related that incident as the cause of his condition. In none of those instances did he mention the fall over the bookcase at Woodruff Drug Company. It was only when confronted with rather conclusive documentary and oral evidence that claimant finally took the position that the fracture occurred on August 9.
The commission reasonably could have made its findings and reached its result upon a consideration of all the evidence before it, which, taken as a whole, constitutes a substantial basis for the commission's finding that the condition complained of by employee was neither caused nor aggravated by an accident of August 9, 1948, arising out of and in the course of his employment.
This case presents the typical situation where the right to compensation depends ultimately upon the acceptance of one of two conflicting medical or scientific theories regarding the cause of the injury, both of which are supported by the professional opinions of medical witnesses. The question is one of fact for the commission to determine and its finding consistent with either of such contradictory opinions necessarily will be upheld by the courts if supported by competent and substantial evidence upon the whole record. Vogt v. Lambert Pharmacal Co., Mo.App., 218 S.W.2d 788; Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657, 662; Lewis v. Champ Spring Co., Mo.App., 145 S.W.2d 758; Driemeyer v. Anheuser-Busch, Inc., Mo.App., 153 S.W.2d 821; Karch v. Empire Dist. Electric Co., 358 Mo. 1062, 218 S.W. 2d 765; Meintz v. Arthur Morgan Trucking Co., 345 Mo. 251, 258, 132 S.W.2d 1010.
Respondent, contending that the award of the commission is against the overwhelming weight of the evidence, points to the testimony corroborating the fall at the drug store, the failure to produce employer's head dispatcher as a witness, argues that the hospital records, diagnosis and X-rays ruled out pathological fracture; that the resident physician at St. Mary's Hospital found no evidence of syphilitic lesion and recorded no evidence of pathological fracture. Attacking Dr. Funsch's testimony, respondent counts heavily on his admission that claimant did not have Charcot's disease; that he found no gumma or syphilitic lesions near the fracture site; that the X-rays showed nothing abnormal in the texture of the bone indicating syphilis; that the doctor did not read the City Hospital record, "lost interest in the case" after claimant left St. Mary's Hospital, and stated that some doctors might call it an impacted fracture, together with his failure to explain how claimant with a fracture was able for a 5-weeks' period after September 4 to go once a week for treatment to Dr. Medler's office. Respondent claims that Dr. Holscher had superior qualifications in the field of orthopedics and stresses Dr. Holscher's testimony, which he says was substantiated by all of the X-rays taken in the case.
Although these considerations would have supported the opposite conclusion they do not make the award of the commission "clearly contrary to the overwhelming weight of the evidence."
Respondent asserts that the commission, which heard no witnesses, should have given deference to the findings of the referee before whom the witnesses appeared, and that in reversing the referee the commission acted unreasonably, arbitrarily and in excess of its powers. The duty of the commission is to review the record, determine the credibility of the witnesses and the weight to be given to their testimony, resolve conflicts therein, and as a fact finding tribunal to reach its own conclusion independently of the findings made by the referee. The findings of the referee are not final and binding upon the commission if, upon consideration of all the evidence, the commission reaches a conclusion different from that of the referee. Douglas v. St. Joseph Lead Co., Mo.App., 231 S.W.2d 258; Diebold v. Great Atlantic & Pacific Tea Co., Mo.App., 241 S.W.2d 31. The commission may or may not come to the same conclusion reached by the referee, but in performing its function it is not bound to yield to the findings of the referee. The duty of this court on appeal is to determine *810 whether the award which the commission makes is supported by competent and substantial evidence upon the whole record.
Entertaining these views, there is no occasion to consider the other points made by appellants.
It follows that the judgment of the circuit court should be reversed and the cause remanded with directions to the circuit court to enter up a new judgment affirming the final award of the industrial commission, and the Commissioner so recommends.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, reversed and the cause remanded.
BENNICK, P. J., and ANDERSON and RUDDY, JJ., concur.