Mae GARNER, Appellant,

v.

RESEARCH CLINIC, a corporation, and Lumbermen's Mutual Casualty Company, Respondents.

No. 22255.

Kansas City Court of Appeals.

Missouri.

June 6, 1955.

Glen V. Graf, Frank C. Kenyon, Jr., Kansas City, for appellant.

Richard P. Sprinkle, Sprinkle, Knowles & Carter, Kansas City, for respondents.

BOUR, Commissioner.

This is an appeal from a judgment of the circuit court affirming a final award of the Industrial Commission in a proceeding under the workmen's compensation law.

Mae Garner alleged in her claim for compensation that on May 28, 1952, she stumbled over a pile of lumber while carrying a bundle of clothes in the course of her employment with Research Clinic, a corporation, and that as a result her back and lower left leg were injured. Research Clinic and its insurer, in their answer, denied each and every allegation in the claim. Hearings upon the claim were held before a referee on October 24, 1952, and November 24, 1952. It was admitted at the first hearing that on May 28, 1952, Research Clinic was an employer operating under the provisions of the Missouri Workmen's

Compensation Law, and that its liability under said law was fully insured by Lumbermen's Mutual Casualty Company; that on May 28, 1952, claimant was an employee of Research Clinic and was working under the provisions of said law; that on said date the claimant sustained an injury by accident arising out of and in the course of her employment; that the employer had notice of the injury, and that a claim for compensation was filed within the time prescribed by law; that the average weekly wage of claimant was $46.86; that no compensation had been paid and no medical aid furnished the claimant. The referee found that on or about May 28, 1952, claimant "sustained an accident arising out of and in the course of her employment with Research Clinic, and as a result thereof sustained injuries to her left lower leg and back, resulting in permanent partial disability of seven and one-half per cent of the body as a whole." His award was $30 a week for 30 weeks.

Upon review by the full commission, the award of the referee was reversed and compensation denied. The commission found "from all the evidence that the condition complained of by Mae Garner, employee herein, was neither caused nor aggravated by an accident May 28, 1952, arising out of and in the course of her employment with Research Clinic, as alleged." As stated, the circuit court affirmed the final award of the commission, and the appeal to this court followed.

Claimant testified at the first hearing before the referee that she was married and lived with her husband; that she entered the service of respondent-employer in December, 1951; that on May 28, 1952, about 1:15 or 1:30 p. m., she carried a bundle of clothes into the basement at employer's place of business in Kansas City, Missouri; that while carrying the bundle she slipped and fell because of "some lumber" on the floor of the basement; that she had a "terrific pain" in her back for a few minutes; that she "kind of blacked out" and could "hardly get up"; that her left leg was bruised and cut below the knee; that the bruise was about one inch wide and

three inches long; that "the blood ran out, but not enough to run down (her) leg"; that her stockings were not torn; and that she worked the rest of the day running an elevator and looking after "the linens". The accident occurred on Wednesday. Claimant worked on Thursday, but not on Friday, which was Memorial Day. She testified that on Saturday morning, May 29, she called Henry Smith, employer's maintenance man, and told him she was too sick to work; and continued: "He said, 'Mrs. Garner, don't you think you had better resign and let us get somebody in your place?' And I was feeling too bad, and I said, 'Just fine,' and that is all he said."

Claimant further testified that after the accident she "doctored around home there, using different things"; that she did not consult a doctor until on or about June 10, 1952, when she went to Dr. R. H. Fitzgerald; that Dr. Fitzgerald examined her and told her how to take care of herself; that she didn't "take a lot of medicines"; that she "took aspirins and soda water with them", and used "hot water bottles * * ointments and linaments or something like that"; that she went to see Dr. Fitzgerald twice; that she did not consult any other doctor; and that she had not worked since May 29, 1952. She continued:

"Q. Have you been able to do anything since? A. Not even my housework. That can be proved by my neighbors. * *

"Q. What is the condition of your back? A. It is terrible. I am give out now all in my lower back and even getting worse on down. * * *

"Q. What about your leg * * *? A. It is healed apparently. It looks pretty good. There is a little scar there.

"Q. What about the feeling? A. It doesn't feel right. It draws and hurts, gives a bit—kind of gives away on me at times and is numb, and I go nearly down.

"Q. You still have some tenderness? A. Yes, sir." The referee questioned claimant as follows:

"Q. You went to Dr. Fitzgerald for the purpose of treatment in June? A. Well, yes, sir; examination and treatment. * * *

"Q. On this second visit did he prescribe for you further? A. No.

"Q. Was that for the purpose of rating, the examination that we have here? A. More or less, I guess; he had me come back, and I went back."

Claimant testified on cross-examination that she "hit the lumber and slipped and fell over it"; that she "just slipped and fell on the lumber with (the) bundle of clothes"; that she "was sick as a dog for a few minutes, and kind of dizzy", but not unconscious; and that she "blacked out" and did not remember whether she fell to the floor. On further cross-examination, claimant testified that "a little while" after she "got up * * * it could have been an hour", she told Henry Smith about the accident and showed him her left leg; that she told Smith she would be "all right"; that Smith did not suggest that she see one of the nurses at Research Clinic; that Smith was her "boss"; that she did not go to any nurse or doctor connected with the clinic; and when claimant was asked, "Did you ever tell anyone there that you hurt your back?" she said, "I don't remember all that stuff". Claimant further testified on cross-examination:

"Q. Both times you saw Dr. Fitzgerald he made an examination and report? A. Yes, sir.

"Q. What kind of treatments did he give you? A. Well, I just went up there, and he examined me. * * *.

"Q. You used your own methods, and Dr. Fitzgerald just examined you, is that correct? A. Well, that is about all. * *

"Q. How frequent is this back pain that you complain of? A. I just tire out. It hurts across in that place in there, and I can't get up and down. * * * It is pretty persistent. * * * I can't stand a lot of work. * * *."

Claimant testified on re-direct examination:

"Q. Did Dr. Fitzgerald give you any medicine or prescribe what medicine to use or things to rub? A. No, sir. * * Told me to take care of myself and take it easy. * * *

"Q. He didn't tell you about any particular light treatments? A. No, sir." She stated that when she went to Dr. Fitzgerald's office "there wasn't anything for him to bandage".

Five witnesses testified at the second hearing. Henry Smith testified on behalf of respondents that he was employed by Research Clinic as a building maintenance man; that he was present at the time of the accident; and continued: "Mrs. Garner always kept a tablet on a little table we have there and she dropped some uniforms, I believe, before she got over this lumber pile; and she went to step over it and she bumped her leg against the edge of the lumber; and she said, 'Look what I have done'; and I said, 'Go have a little mercurochrome put on it'; and she said, 'If I want that I will put it on at home. There is nothing to it.' * * *

"Q. Did she fall? A. No.

"Q. Did you have to help her in any way? A. No. * * * She made no complaint to me. She just showed me the place on her leg. * * *

"Q. That is the only time she said anything to you about it? A. That is right." Smith testified on cross-examination:

"Q. When she called up the day after Memorial Day and said she wasn't able to come to work because of the effects of the accident, you said, 'You had better not come back at all'? A. No.

"Q. That you would get somebody else? A. No. * * *

"Q. Did she fall over this lumber? A. No. * * *

"Q. Did she trip over the lumber? A. No. * * * I did offer to take her up to

420

the nurse. She refused to go * * *." Smith's wife, a witness for respondents, testified that she was present at the time of the accident. Her testimony tended to corroborate the testimony of her husband.

Mrs. Sylvia Mills, an elevator operator at Research Clinic, testified as a witness for respondents. She said: Claimant "got on the elevator and asked me if I knew she had hurt her leg, and I said, 'No'; and she showed me a scratch on her leg. * * * I asked, 'Did you run your hose?'; and she said, 'No'; and I said, 'Go up and have the girl put something on it'; and she said, 'It didn't amount to that much.'" Mrs. Mills stated that this occurred on or about May 28, 1952; that claimant looked the same as she always did; that she saw claimant several times after the conversation on the elevator; and that claimant "did not complain of her back".

We turn now to the testimony of the doctors. Dr. Fitzgerald, testifying on behalf of claimant, stated: "I first examined her on June 10. * * * The history disclosed that on May 28, 1952, while carrying a bundle of laundry, she struck a pile of lumber with her leg and sustained a laceration on the front of the leg. She did not completely fall to the floor, but stated that she stumbled. She further stated that she was sick for a few moments and she almost blacked out. She further told me that she injured her back as a result of the impact with the lumber. * * * At the time of my first interview with her, her complaints were referable to her low back, her back had a catch in it; that she was unable to stoop or bend; and that she has pain and aching in the lower portion of her back. In reference to her lower right leg, she stated that she was having some cramps and pain in her leg; that the lacerations were healing at that time. * * Examination of the spine with the individual standing revealed the shoulders to be level. The pelvis was level. There was present a dorsal kyphosis with a flattening of the lower back." He said "the flattening could be the result of postural defects or result of injury." He further stated:

"Forward bending was carried out without any particular limitation. * * * Backward and side bending are not limited. There is no spasm of the muscles in the lumbar area. Examination of the individual in the supine position revealed the legs to be of equal length, * * *. Straight leg raising is to 90 degrees bilaterally. Hip motion is normal. * * * The spine is straight. There was tenderness present in the region of the left sacroiliac and lumbosacral joint areas on palpation and percussion. Hyperextension of the torso and of the extremities is carried out actively. There was no atrophy present. The reflexes at the knee and ankle were present, equal and physiological. Examination of the left leg below the knee revealed an area of discoloration which was confined to the region of the anterior crest and measured 4 inches in length and 3 inches in width. There was some residual thickening, particularly laterally over the region of the anterior tibial muscle. There were healed and healing abrasions present. Flexion and extension of the ankle were normal. There was no limitation of motion of the knee. The patient was able to sit to 90 degrees without any difficulty, with the knees in extension. There was no limitation of motion with the knees in extension or in flexion, on forward bending.

"Q. Now, doctor, as a result of the history that Mrs. Garner gave to you and as a result of your examination you made on July 24, 1952, did you reach a conclusion as to the disability she may have sustained? A. I examined her again on July 24. I feel there is no change in the findings as noted in the original report, except that the induration about the area of the laceration over the left tibia had definitely improved at that time and the conclusion I came to was that in my opinion this individual at that time had a permanent partial disability of 5 per cent to 10 per cent of the body as a whole referable to her back as a result of a lumbosacral, sacro-iliac type of sprain involving particularly the left sacro-iliac joint, and had a residual from the trauma to her left lower leg.

"Q. You took into consideration in figuring this disability both the leg and the back? A. Yes, sir."

On cross-examination, Dr. Fitzgerald testified:

"Q. If this woman had struck her left leg on the pile of lumber and received a bruise that you found to exist in the left tibia and she didn't slip or fall or lose her balance and remained on her feet, could she have sustained this type of back injury? A. If I am to assume the situation, my answer would be no.

"Q. Your report is based entirely upon subjective findings with the exception of the leg disability? A. No.

"Q. Was it subjective when you indicated this back injury? A. Well, the tenderness is, of course, subjective. She complained of tenderness, as far as the back; and, of course, as far as her leg, she had evidence of the injury."

Dr. Charles E. Vilmer, testifying for respondents, stated: "I saw Mrs. Garner on August 15, 1952. * * * The patient stated * * * that on May 28, 1952, while she was working in the Research Clinic * * * she stumbled over some lumber * * *. At this time the patient had a severe pain in the rectum and across the small of her back. The patient explained that she fell forward across the lumber, causing laceration of the left leg, just below the knee. * * * (S)he had an area of contusion about 4 inches below the left tibial tuberosity * * *. which then had assumed a yellowish, green color and was about the size of a silver dollar and laid just medial of the tibial crest at this site. There are two or three tiny scars at this site." Dr. Vilmer said that he found "injury to the soft tissues there", but that X-ray pictures of the left tibia disclosed no injury to the bone. He stated that there was an area of complaint in the back, between the left sacroiliac joint and the lumbosacral joint. Right lateral flexion caused pain in this area to a mild degree; there was a moderate knock-knee present. Otherwise there was no evidence of any pathology. There was no muscle spasm present. Reflex and reactions were normal. X-rays of the lumbosacral spine disclosed nothing. abnormal. Claimant "got up and off the table with comparative ease and had no difficulty in bending forward to tie her shoes". The doctor said that if claimant sustained an injury to her back at the time of the accident, she "would have immediate pain".

Dr. Vilmer testified on cross-examination:

"Q. Was there complaint of pain on right lateral flexion? A. * * * (S)he had pain in that area, yes, sir. * * * There was a mild tenderness in the lumbosacral joint and in the other midway between the left sacroiliac joint and the lumbosacral joint. * * *

"Q. What do you think caused that pain? * * * Was it a sprain or what? A. It could have been deep pressure on the lumbosacral joint. A postural defect (or a) sprain will cause tenderness in that area, but usually a sprain has a limitation of time * * *.

"Q. She gave a history of falling across this lumber and injuring her back. Would you say the pain was not caused from that? A. No, sir.

"Q. And you stated she had a mild disability due to this injury in your report? A. Yes, sir * * * I don't consider a sprain in the back to be permanent in nature considering the clinical findings. * * * Usually takes several months to get well. * * *

"Q. But if she was continually on her feet * * * A. It would cause a mild aggravation of any sprain that she had in the back."

Dr. Vilmer testified on re-direct examination:

"Q. This flatness you found in her back, could that be a postural defect? A. Yes, sir.

"Q. Upon what basis was your finding of pain in the back? You stated she ex-

perienced pain in doing some of these movements. A. A certain amount of pain in older individuals is entirely within normal limits due to the activity of the patient. That is, going through some of these movements and using parts of their body that they don't normally use to any great degree. A postural defect may throw an aggravation to one part of the lumbosacral spine and with an undue amount of motion they will feel pain. She did have some postural defect. She did have a mild amount of pain over an area which was consistent with the aggravation. It was an entirely normal finding. Undue activity." On re-cross examination, the doctor testified:

"Q. From the history she gave you, it is entirely possible, is it, doctor, she could have sustained this sprain from the accident, isn't that right? A. Yes, sir."

■ Claimant-appellant contends that the award denying compensation is not supported by competent and substantial evidence and is clearly contrary to the overwhelming weight of the evidence. In reviewing a workmen's compensation case, the court must determine whether the commission's award is supported by competent and substantial evidence upon the whole record. Const. art. 5, sec. 22, V.A.M.S. This does not mean that the reviewing court may substitute its own judgment for that of the commission; but the court is authorized to determine whether the commission could reasonably have made its findings and reached its result, upon consideration of all of the evidence before it; and to set aside decisions of the commission only when they are clearly contrary to the overwhelming weight of the evidence. Lunn v. Columbian Steel Tank Co., Mo., 275 S.W.2d 298, 301; Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136, 141. In Woodward v. J. J. Grier Co., Mo. App., 270 S.W.2d 155, 159, this court said: "The question of the deference to be given the finding of the Referee and the finding of the Commission, when in conflict, is fully discussed by the court en banc in Michler v. Krey Packing Co., supra, and we need not elaborate on that issue. Suffice it to say the holding is that it is the award of the Commission that is reviewed by the court and not the award of the Referee; that judicial review is on the whole record, and the Referee's award, findings of fact and rulings of law are a part of the record; and the court must decide whether the finding of the *Commission* is 'supported by competent and substantial evidence upon the whole record'." See also Ossery v. Burger-Baird Engraving Co., Mo.Sup., 256 S.W.2d 805, 808; Brown v. Griesedieck Western Brewing Co. of Mo., Mo.App., 250 S.W.2d 803, 809; Diebold v. Great Atlantic & Pacific Tea Co., Mo.App., 241 S.W.2d 31, 34. Furthermore, the reviewing court must view the evidence in the light most favorable to the findings and award of the commission. Spradling v. International Shoe Co., Mo.Sup., 270 S. W.2d 28, 30.

■■ Claimant urges that the commission erred "in not considering the report of accident as an admission against interest and competent evidence to support an award", citing Tralle v. Chevrolet Motor Co., 230 Mo.App. 535, 92 S.W.2d 966, 970, where the court held that a report of accident filed by the employer with the commission "is analogous to a pleading and is admissible and binding in the same way as a pleading as to admissions therein against interest, and is admissible in evidence in the same manner as a pleading". In the case at bar the record shows that a report of injury was filed with the commission, stating that Mae Garner had sustained an injury to her "left leg" in an accident on May 28, 1952, and purporting to have been signed by "Henry Smith, Engineer". The report also states: "Engineer states claimant showed him a slight red mark on her left leg and said, 'Look what I did on the lumber pile?' Engineer states he suggested she go to nurse, and claimant replied she would take care of it herself." Henry Smith, a witness for respondents, testified upon cross-examination that he did not sign the report, whereupon counsel for

claimant read the last quoted statement, and continued: "Didn't you testify to these facts? A. (by Smith) I testified to * * *.

"Q. Didn't you testify * * *.

"The Referee: Let's not get into an argument. The record will show what he testified to, and the exhibit is self-explanatory." There is nothing in the record to show that the commission did not consider the report. Furthermore, all of the facts stated in the report were either formally admitted by respondents or fully disclosed by the testimony of respondents' witnesses. Claimant's argument concerning the report is without merit. The same is true of claimant's contention that the commission erred "if it considered the testimony of respondents' employees Henry and Margaret Smith and Sylvia Mills", citing Beatty v. Chandeysson Electric Co., 238 Mo.App. 868, 190 S.W.2d 648. That case does not support claimant's position.

■ Claimant asserts that the commission ignored "the admission by respondents' attorney that appellant sustained injury". Counsel for respondents did formally admit at the first hearing before the referee that on May 28, 1952, claimant sustained an injury by accident arising out of and in the course of her employment, but in so doing they did not admit that any disability resulted therefrom. Nor did they make any admissions as to the nature and extent of the injury. The record shows that the real controversy at the hearing before the referee was whether the claimant suffered any disability as a result of the accident. Claimant also urges that the commission was not authorized to reject claimant's unimpeached and uncontradicted testimony. In this connection, claimant cites cases in support of the rule that the commission may not arbitrarily disregard and ignore competent, substantial and undisputed evidence of witnesses who are not shown by the record to have been impeached, and may not base its finding upon conjecture or mere personal opinion unsupported by sufficient competent evidence.

The cases cited are Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149; Cain v. Robinson Lumber Co., Mo.App., 273 S.W.2d 741; Moore v. R. C. Can Co., Mo.App, 229 S.W.2d 272. It is true that the commission may not arbitrarily disregard and ignore competent and substantial evidence, but it is not required to accept it as true. McCoy v. Simpson, 346 Mo. 72, 139 S.W.2d 950; Powers v. Universal Atlas Cement Co., Mo.App., 261 S.W.2d 512. The commission had the right and duty to pass upon the credibility of claimant as a witness and could disbelieve her testimony even if there were no evidence to contradict or impeach it. Smith v. Smith, 361 Mo. 894, 237 S.W.2d 84, 89; Foster v. Carter Carburetor Corp., Mo.App., 264 S.W.2d 904, 909. It appears, however, that claimant's testimony was not uncontradicted.

As stated, claimant testified that she "hit the lumber pile and slipped and fell over it"; that she "just slipped and fell on the lumber with (the) bundle of clothes"; that she "blacked out" and could "hardly get up"; that her left leg was bruised and cut below the knee and she had a "terrific" pain in her back; that a "little while" after she "got up—it could have been an hour", she told Henry Smith about the accident and showed him the bruise on her left leg; and that Smith did not tell her to see one of the nurses at Research Clinic. On the other hand, Smith testified that at the time of the accident he was sitting in a chair near the pile of lumber; that claimant did not "fall" or "trip over the lumber"; that "she went to step over it and bumped her leg against the edge of the lumber"; that he told her to see one of the nurses, and she refused to do so; and that she did not complain of her back. The testimony of claimant and Smith was conflicting as to what was said when claimant called Smith on Memorial Day. The testimony of Mrs. Smith tended to corroborate that of her husband. According to Mrs. Mills, the elevator operator, claimant showed her the bruise but did not complain of pain in her back. Claimant's tes-

timony is replete with inconsistencies. She testified to facts which in all likelihood were not true if the Smiths are to be believed. She said that she had not been able to do housework or any other kind of work since May 29, 1952, and "that can be proved by my neighbors". She did not produce her husband or any of her neighbors as witnesses, nor did she offer any excuse for failing to do so.

According to claimant's evidence, she saw Dr. Fitzgerald on two occasions, and strangely enough he did not prescribe any medicine or recommend treatments of any kind. Dr. Fitzgerald testified that at the time of the first examination claimant complained that her back had a catch in it; that she was unable to bend or stoop; and that she had pain in the lower portion of her back, and cramps and pain in her left leg. On the other hand, the doctor said forward bending was carried on without any particular limitation; that backward and side bending were not limited; that there was no limitation of motion with the knees in extension or in flexion, or forward bending, etc. He said she complained of tenderness in the region of the left sacroiliac and lumbosacral joint on palpation and percussion. He found an area of discoloration below the left knee and some residual thickening over the anterior tibial muscle. As stated, it was this doctor's opinion, at the time of the second examination on July 24, 1952, that claimant had a permanent partial disability of five to ten per cent of the body as a whole referable to her back as a result of the lumbosacral sacroiliac type of sprain, involving particularly the left sacroiliac joint, and had a residual from the trauma to her lower left leg. He admitted, however, that if claimant had struck her left leg on the pile of lumber and sustained the bruise that he found to exist and she did not slip or fall or lose her balance and remained on her feet, she could not "have sustained this type of back injury." Witness Smith testified that claimant merely bumped her leg against a piece of lumber, while claimant said she slipped and fell, thus presenting an issue of fact. While Dr. Fitzgerald testified that claimant's permanent partial disability "was the result of the back and leg combined", he gave no reasons for believing that the "sacroiliac type of sprain" was permanent. He did say, however, that in reaching the conclusion regarding the extent of claimant's disability, he took into account the history of the case as related by claimant.

Dr. Vilmer testified that when he examined claimant on August 15, 1952, he found no muscle spasm; that X-rays of the lumbosacral spine disclosed nothing abnormal; and that claimant got on and off the table with comparative ease and had no difficulty in bending forward to tie her shoestrings. He stated that right lateral flexion caused pain to a mild degree between the left sacroiliac joint and the lumbosacral joint; that when an older person goes through such a movement, a certain amount of pain in that area is normal— an entirely normal finding; that a postural defect or a sprain will cause pain in that area, but usually a sprain has limitations of time; and that claimant had some postural defect. He further stated that claimant told him she fell forward across the pile of lumber, and that in view of the history she gave him, it was possible that she sustained a sprain as a result of the accident; and that she had "a mild disability due to this injury". Dr. Vilmer also testified that claimant had an area of contusion below the left knee, about the size of a dollar; that this area was a yellow, greenish color; that he found "injury to the soft tissue there", but not injury to the bone.

From a careful consideration of the record, we have reached the conclusion that the award of the commission, denying compensation, is based upon competent and substantial evidence; and that the finding and award are not contrary to the overwhelming weight of the evidence. The judgment of the circuit court should be affirmed.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed.

CAVE and BROADDUS, JJ., and ROSE, Special Judge, concur.