GERTRUDE ADAMS, RESPONDENT, v. LILBOURN GRAIN COMPANY AND FIDELITY & CASUALTY CO. OF NEW YORK, APPELLANTS.—48 S. W. (2d) 147.

Springfield Court of Appeals. March 7, 1932.

*Geo. A. Hodgman* for appellants.

*Gallivan & Finch* for respondents.

COX, P. J.—Action before the Workmen's Compensation Commission under the State Workmen's Compensation Act for the death of John E. Adams, husband of plaintiff. At a hearing before one commissioner, an award was made. Upon a hearing before the full commission, this finding was reversed and an award denied. From this action of the commission the claimant appealed to the circuit court of New Madrid county. That court reversed the finding or conclusion of the commission and remanded the cause to the commission for further action for the reason that in the opinion of the court there was not sufficient competent evidence in the record to support the finding of the commissioners. Defendants appealed from that order of reversal to this court.

There is but one question for us to determine here and that is was the finding of the commission supported by sufficient competent evidence to sustain it. If its finding that the claimant was not, under the facts proven, entitled to compensation, is supported by sufficient evidence to warrant that finding, then the circuit court was wrong in setting it aside and remanding the cause to the commission for further proceedings. If not so supported, then the circuit court was right and its judgment should be affirmed. This will necessitate a review of the testimony presented to the commission.

The defendant, Lilbourn Grain Company, had five tractors shipped to it at Lilbourn. They were in a closed freight car that had doors on each side about the middle of the car. There were three small tractors and two large tractors. The car was placed on a track running east and west for unloading. The three small tractors were

in the east end of the car and the two large tractors in the west end. The tractors were cross-wise in the car which left but little space between the ends of the tractors and the sides of the car. Two of the small tractors were near enough to the door of the car that they could be rolled out by hand and they were unloaded in that way. The other small tractor and the two large tractors were so situated that they must be moved side wise a considerable distance to get them in front of the door before they could be pulled out through the door and be, in that way, unloaded. In order to move these other tractors up in front of the door of the car, they filled one small tractor that had been unloaded with gasoline and oil and backed it into the car and then fastened it with a chain to one end of the tractor to be moved and would pull that end toward the door as far as they could and would then loosen the chain and fasten it to the other end of the tractor and pull it forward toward the door as far as they could, then go back to the other end and move it forward in the same way and would keep this up until the tractor was pulled up in front of the door and it was then pulled out on the platform. To get the small tractor out in this way required about thirty minutes. The large tractors were removed in the same way. To remove the first large tractor required about one hour and to remove the last one about the same time or a little longer. When a tractor was unloaded, it would be pulled down to the mill and left there. The deceased went along and was out of the freight car about ten minutes on each occasion. When in the freight car attending to fastening the chain, etc., he was down on his knees and working near the floor. The time he was thus engaged amounted in all to about two and one-half hours. During this time he was helping take tractors to the mill at two intervals of about ten minutes each. The exhaust of the live engine was on the side and some three or four feet above the floor and turned slightly toward the front. The tractors were unloaded on the north side and the doors on the south side of the box car were closed all the time until shortly before the last tractor had been pulled up in front of the door to be unloaded when another party came into the car and he said the smoke was so bad in the car that it hurt his eyes and he then opened the door on the south side.

It was shown that when the work was finished, the deceased went home and then complained of a severe headache and pains in his stomach, ate but little supper and said the next morning that he could not sleep and still complained of a severe headache and pain in the stomach or bowels. He went back to work that day and he worked most or all of the day and also complained of the same pains as before. He went home at noon in the same condition and ate but little. The same thing was true in the evening. He did not sleep

that night and ate very little, for breakfast next morning, still complaining as before. He went back to work that morning but found he could not work. He laid down a little while and was then taken home and a doctor called. At that time he vomited and was in misery all over. He died in about fifteen minutes after the doctor arrived. The doctor gave him an injection of one-sixtieth of a grain of strychnine but it did not restore him and, as said, he died in a few minutes thereafter. The doctor in his testimony described the symptoms of the deceased after he arrived as indicating monoxide gas poisoning and in his judgment it was monoxide gas poisoning that caused his death. Monoxide is a form of poison resulting from the inhalation of the gas thrown off by gasoline engines such as is used in the operation of tractors and automobiles. The deceased was a strong healthy man and very determined and would not stop work until compelled to do so by inability to proceed. The brother of deceased operated the small tractor that was used in moving the other tractors in the box car and he was affected in the same way as the deceased though not so severely. He also had a headache and pains in the stomach and the smoke affected his eyes as it did the eyes of a party who opened the door on the south side of the box car. His headache continued until noon of the next day when it left him. He felt like vomiting but he did not. Opposed to this testimony for plaintiff was the testimony of a doctor from St. Louis who testified for defendants that the same symptoms which were present in the deceased would also be found present if he were afflicted with poison accompanying a number of other diseases in an acute form such as heart disease, asthma, bronchitis, kidney conditions and strangulated hernia and that there was no way to determine with certainty that the deceased had died with monoxide poisoning without an autopsy after his death or blood test and urinalysis before death. He also heard the testimony on behalf of plaintiff and then gave it as his opinion that death did not result from inhaling poisonous gases while working in the box car.

The Referee before whom the case was first heard found as follows: "Employee was engaged in unloading tractors from a freight car using another tractor to pull the dead tractors from the car. He became ill immediately and died within thirty-six hours. He was in perfect physical condition prior to that time and another workman suffered like symptoms after working in the same freight car but has apparently fully recovered. The discharge of the gases from the gasoline engine used in the operation is claimed to be the cause of the complaints and the attending physician diagnozed the case as one of monoxide poisoning.

That the employee was subjected to the effects of carbon monoxide poisoning is not disputed nor is it disputed that the symptoms were such as follows exposure to such poison. Whether other complications entered into the cause of death would not defeat the claim for compensation. The only reasonable inference that can be drawn from all the facts is that the primary cause of death was the exposure to the gas poison which was an accident arising out of and in the course of his employment within the meaning of section 7, Workmen's Compensation Act, Laws of 1927.''

On this finding he made an award in favor of plaintiff.

The case then went to the full commission. The full commission, by two members thereof, reversed the finding of the one referee and denied compensation as stated in their finding ''For the reason it is our opinion that the employee's death was due to other causes and not due to carbon monoxide poisoning arising out of and in the course of his employment.'' The one commissioner who heard and saw the witnesses and found for plaintiff, dissented from the finding of the other two commissioners.

The plaintiff appealed to the circuit court which set the finding aside because not supported by sufficient competent evidence and defendants then appealed to this court.

We are cited to a large number of cases by appellant to sustain the proposition that the finding of the commission on a question of fact stands in the same position as the verdict of a jury and in the absence of fraud neither the circuit nor appellate court can set it aside as against the weight of the evidence for the duty to weigh the evidence is a prerogative that belongs exclusively to the commission. We have read all these cases and without citing them, it will suffice to say that they sustain the position of appellant and we so hold in this case. The statute, section 3342, Revised Statutes 1929, expressly provides that on appeal from the commission to the circuit court ''No additional evidence shall be heard and in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding.'' The same section enumerates the grounds upon which an award of the commission may be set aside by the circuit court, the last of which is as follows: ''4—That there was not sufficient competent evidence in the record to warrant the making of the award.''

The authorities all agree that the circuit court and the appellate court shall treat the finding of facts of the commission in the same way and give this finding the same effect as would be given the verdict of a jury in an ordinary law action and the appellate courts should not set aside, or approve the action of the circuit court in setting aside, the finding of the commission except in those cases

where the same action in setting aside the verdict of a jury would be approved. We find by an examination of the authorities that in some cases the appellate court will set aside the verdict of the jury after it has been approved by the trial court in order to prevent a. miscarriage of justice. This question is discussed and authorities cited by the St. Louis Court of Appeals in Spiro v. St. Louis Transit Company, 102 Mo. App. 250, 76 S. W. 684, in an opinion by Judge R. L. GOODE, one of the most able jurists that ever graced the bench in this State. In that case on page 263, we find the following language:

"Verdicts resting on evidence which is contrary to the ordinary course of nature are not infrequently set aside and retrials directed by appellate courts as a proper precaution against an unjust outcome of litigation. While it is fundamental that juries must weigh evidence and trial judges revise their findings, instances happen in which from one cause or another this practice so obviously fails to work out a right result that an imperative call is heard to supplant it by an exceptional procedure in order that justice, the end of all procedure, may not be frustrated. This prerogative of courts of error is seldom employed but that it exists as an emergency in safety for the correction of verdicts palpably wrong is certain. The appropriate use of it does not require a court to be convinced that the jury found an event to have occurred that was physically impossible or miraculous. It is enough that if the event found was so improbable according to the ordinary operation of physical forces, or was so overwhelmingly disapproved by credible witnesses, as to compel the conviction that the jury either failed to weigh the evidence carefully·or drew unwarranted inferences or yielded to a personal *bias*. We have decided to grant another trial in this cause, having reached that decision not only after much reflection on the evidence but·after study of the precedents in this State in which a similiar course was taken. They are more numerous than we supposed, thus demonstrating that while appellate tribunals are reluctant to interfere with a verdict on account of insufficient evidence, they are more reluctant to accept it as conclusive when given at the first hearing if it cannot be accounted for by rational theories." He then cites and comments on a number of cases in this State in which new trials were awarded by the Supreme Court on the ground that the verdict was so at variance with what appeared to be a rational conclusion that to permit it to stand would clearly result in a miscarriage of justice. He then said, "Those authorities suffice to exhibit the different aspects in which the question of disallowing weight of evidence on account of its inherent improbability has been viewed. There are many others (some of which we cite) in which verdicts have been set aside on that

ground alone. [Several cases are here cited.] The warrant for appellate interference of this character is a finding by the jury incomprehensible on any theory consistent with a proper regard for their duty to determine issues according to law and evidence.''

We take the last sentence quoted above as stating in succinct form the rule by which appellate courts are to be governed. If the verdict of the jury—in this case the finding of the commission—is ''incomprehensible on any theory consistent with a proper regard for their duty to determine the issues according to law and evidence,'' then it was the duty of the circuit court to set aside the finding and it will be our duty to affirm his action in doing so. Juries are supposed to be composed of men of good judgment and who are disposed to be fair and impartial. It is also supposed that the Workmen's Compensation Commissioners are men of the same type and in passing on the facts in a case will act as a jury would act and find according to the evidence. If we place ourselves in the position of the triers of the facts in this case and review the evidence heretofore set out, it seems to us that no rational man of fairly good judgment could reach any conclusion other than that the deceased died of carbon monoxide poisoning. If we take plaintiff's evidence alone no reasonable man could reach any other conclusion. The undisputed evidence was to the effect that deceased was a strong man, in perfect health and the fact that he worked in this box car where smoke and gas escaped from the small tractor was not denied. This gas and smoke also affected his brother who drove the small tractor so that he had the same symptoms as did deceased and he was sick until noon the next day. The physician who examined the deceased shortly before he died testified that his symptoms were that of monoxide poisoning and in his opinion it was that poison that caused his death. The only evidence against that of plaintiff is the testimony of a physician from St. Louis who personally knew nothing of the facts and who did not see the deceased at all. He testified as an expert that, in his judgment, the deceased did not die of carbon monoxide poisoning, or at least that the evidence did not so show, but gave no opinion as to what did cause his death. He said that the same symptoms would be present if he were afflicted with one of several other ailments which he named, to-wit, heart disease, asthma, branchitis, stomach trouble, kidney trouble or strangulated hernia. The whole trend of his testimony shows that he was testifying from a scientific stand point. He said there was no way to be certain that monoxide poison caused the death without a blood test and urinalysis before death or an autopsy after death, but the man of ordinary good sense who was not misled by this scientific discussion or by some other unknown feature, would have no trouble in settling in his own mind, and in our opinion it would be incom-

prehensible for him to arrive at any other conclusion, that a strong healthy man who had never had any of the diseases named by the expert but who had worked for two and one-half hours in the smoke and gas in that box car and then took sick almost immediately thereafter and died in about thirty-six hours with symptoms of monoxide gas poisoning, died of that poison.

We agree with the referee who first heard the evidence and the commissioner who dissented when the claim was denied that ''The only reasonable inference that can be drawn from all the facts is that the primary cause of death was the exposure to the gas poison . . .''

The two commissioners who unite in denying that claim said: ''On review, award dated April 5, 1930, is hereby reversed and set aside for the reason it is our opinion that the employee's death was due to other causes and not due to carbon monoxide poison . . .'' In our opinion this finding is not supported by sufficient competent evidence but is ''incomprehensible on any theory consistent with a proper regard for their duty to determine issues according to law and evidence'' and we are firmly convinced that the trial court was right in setting the finding aside and remanding the cause to the commissioners for further proceedings.

The judgment will be affirmed. *Bailey* and *Smith, JJ.,* concur.