ESTHER MEINTZ, Dependent of FRED MEINTZ, Appellant, v. ARTHUR MORGAN TRUCKING COMPANY, Incorporated, Employer, and AETNA CASUALTY & SURETY COMPANY, a Corporation, Insurer.—132 S. W. (2d) 1010.

Division One, November 3, 1939.

252

*Ely & Derrick* for appellant.

*Luke & Cunliff* and *Thomas R. Pascal* for respondents.

HYDE, C.—This is an appeal by a claimant under the Workmen's Compensation Act (Chapter 28, R. S. 1929), from the judgment of the Circuit Court of the City of St. Louis affirming an award of the Commission in favor of the employer and insurer.

The claim was by the widow of Fred Meintz for $9788.30 for his death from pneumonia alleged to have resulted from infection and weakened resistance caused by a broken arm sustained while at work for his employer, the Morgan Trucking Company. The referee who heard the claim found against claimant and his award was affirmed upon hearing by the whole Commission. The finding of fact made was "that the death of the employee on April 11, 1937, was not the result of the accident sustained by said employee on November 6, 1935." The principal assignment of error briefed and argued on behalf of claimant is that the award was erroneous "for the reason that there is not sufficient competent evidence in the record to support the award." Claimant, of course, had the burden of proof of this essential fact issue of causal connection. [Miller v. Ralston Purina Co., 341 Mo. 811, 109 S. W. (2d) 866; Adams v. Continental Life Ins. Co., 340 Mo. 417, 101 S. W. (2d) 75; DeLille v. Holton-Seelye Co., 334 Mo. 464, 66 S. W. (2d) 834; Doughton v. Marland Refining Co., 331 Mo. 280, 53 S. W. (2d) 236.] Claimant argues the matter as though the facts were undisputed and this is only a case involving a question of law citing decisions where that was the situation such as Kristanik v. Chevrolet Motor Co., 335 Mo. 60, 70 S. W. (2d) 890, and Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S. W. (2d) 909. It is apparent from a review of the evidence (even claimant's evidence hereinafter reviewed) that there was conflicting testimony concerning essential fact issues.

Meintz broke his left arm in an automobile accident (not connected with his employment) in September, 1935. He went back to work for the Morgan Trucking Company on November 3, 1935. While changing a tire of one of his employer's trucks, on November 6, 1935, he slipped and fell refracturing his arm in the same place. Both breaks were compound fractures in the elbow joint. Dr. O. P. Hampton treated him both times. After the first break the doctor "wired the fragments back together," and after the second break "the fragments were rewired together." Thereafter "a low-grade infection or irritation, sinus formation" developed. The doctor said: "It was either caused by the irritation of the wire which was necessarily left buried there, or a low-grade infection in the fracture site

in the bone or soft tissue infection about the bone. . . . The wound continued to drain at one or two points after the primary stage of healing for several months. One wound would open and close, and the second would open and close. Finally in May of 1936, the wound seemed to be healed entirely. . . . Everything seemed to be fine; motion was increasing, though not complete. On July 5, 1936, it opened with a slight drainage and it opened again on the 28th of July. At that time his wound was probed to get any loose pieces of bone. These two drains were from a small sinus over the fracture site. I saw Meintz again in the fall. (October, 1936.) At that time the wound opened again and drained off two or three days and closed up.''

Meintz went back to work in March, 1936, and was paid on a claim for compensation, for 20 per cent permanent loss of use of his left arm, the total amount of $1190.30. Thereafter, he lost a week from work in September, 1936, because of a ''gastro-intestinal upset . . . probably caused by dietary indiscretion or poor food'' also treated by Dr. Hampton. Claimant's testimony was that in January, 1937, ''he had a cold and was off from work a week,'' and that in February, 1937, ''he was off another week'' from sickness. It was not shown that any doctor attended him on these two occasions. The employer's testimony was that from January 9 to 16, 1937, Meintz was laid off because he was ''under the influence of liquor'' during working hours. There was also evidence of considerable use of alcoholic beverages by Meintz at other times. On February 1, 1937, Meintz went to Dr. G. C. Lyttle, who said he ''found a localized inflammation,'' in his elbow. Dr. Lyttle further stated: ''I put my surgical dressing and wet pack on him and he returned on February 4 and the inflammation had subsided some, and while I requested him to return the next day, he did not return until March 6. The same condition was present then which was present before on my first examination. On March 6 I made a small incision under a local anesthetic to remove the small sequestered bone. At that time there was some suppurating discharge. It was just a mucopurulent discharge which might have been caused during the sloughing off from that sequestered bone. He returned for treatment March 7, 8, 9, 11, 13; and on March 13 there was no discharge—the wound had healed. When I first observed this wound it was chronic. The inflammation was localized. . . . The piece of bone I removed was a little more than a quarter of an inch in length, and between one-eighth and one-sixteenth of an inch thick.''

On March 15, 1837, Dr. Lyttle was called to the Morgan Trucking Company plant when Meintz collapsed while at work. He decided that he was suffering from pneumonia and advised that his family doctor be called. Dr. A. T. Vogler took charge of the case and treated Meintz at his home until March 25th. He testified: ''My diag-

nosis was lobar pneumonia involving the right side of the chest. . . . . His condition improved and continued very favorably for seven days. After the right lobe started to clear up, pneumonia developed in the left lobe, which was between the seventh and tenth day. On the 25th he developed his second chill and we removed him to the hospital. The second chill indicated something extremely infectious. . . . We took him to the Missouri Baptist Hospital and X-rayed him immediately. The X-rays indicated a clearing of the right lung and the entire left lung involved."

Dr. Hampton was called to the hospital on March 29, 1937. He testified as follows: "After getting X-rays of his chest, I diagnosed his condition as lung abscess of the left chest. In my opinion, the abscess was in the lung at the time I first saw him; as it developed it worked toward the surface and eventually reached the surface of the lung and became a combined lung abscess and empyema. He was quite an ill man, spitting up large quantities of pus, and his condition seemed to improve, but finally an operation was deemed advisable, and on the 10th of April I resected two portions of ribs opening into the large abscessed cavity which was draining. He was unable to withstand the operation and expired at about 2 A. M. on the morning of April 11."

Dr. Lyttle had known Meintz for seven or eight years prior to the time he treated his arm in February, 1937. He said that he "noticed no difference in Fred Meintz's general condition," and that he "noticed no lowered vitality or lowered resistance;" and that "Meintz appeared to be as healthy as I had ever known him." He further said: "I did not connect Meintz's lobar pneumonia and the injury to the arm," and upon being asked if in his opinion there was any connection, answered: "I do not believe so." He based this opinion upon his determination that the infection in the elbow was a low-grade infection and not virulent; that the sinus was well walled up; that the inflammation was localized; and that on March 13th he "found that the inflammation has subsided and the wound had healed."

Dr. Hampton, who had seen and treated Meintz very frequently for more than a year prior to his death, when asked his opinion as to whether the condition of his arm caused or contributed to cause the pneumonia, said: "I think that it probably did not." He further said: "The infection which Meintz had was a mild one, rather than a severe one. I don't think there was any metastic infection. . . . It is my opinion that pyemic or infective processes were not disseminated through his system. Having the localized infection at a particular area, walled off by thickened tissue so that it has become chronic, there is less likelihood of that infection spreading through the system." He also said: "People who indulge in large amounts of alcohol are considered more prone to pneumonia than those who do not."

Dr. Vogler was not asked his opinion as to causal connection, although called by claimant as were all doctors who actually treated Meintz. He stated that "no one ever said anything to me about his arm." The nurse who attended Meintz testified that "there was no bandage on his arm;" that she "saw no open sore," and that she "did not see any scar there." No notation of any arm condition was made in Meintz's hospital record. Dr. Vogler, however, made the death certificate which stated the principal cause of death "abscess of left lung, localized empyema," and other contributory causes of importance "lobar pneumonia." On behalf of employer two doctors testified, who had not seen Meintz, but gave their opinions upon hypothetical questions. Both answered that there was no connection between Meintz's death and arm injury. Claimant had the testimony of three other doctors, none of whom had seen Meintz, who gave opinions to the effect that Meintz's arm infection did contribute to his final illness.

Claimant's brief states:

"It is claimant's theory that the facts as testified to by the lay witnesses, Dr. Hampton and Dr. Lyttle, as well as Dr. Vogler, relative to Meintz's injury, the manifestations that later accrued, his physical condition after the injury, the chills that he had previous to the onset of pneumonia, and the entire picture presented by the evidence, conclusively and overwhelmingly overcome the opinions and conjectures of the two so-called experts, Miller and Diehr, so that the facts are so preponderantly one way, that as a matter of law this court should reverse the finding of the Commission and determine that there was a causal connection between the injury, infection, weakened resistance, and the pneumonia or abscess, and death of Fred. Meintz."

The facts testified to by claimant's lay witnesses upon which claimant relies, as set out in claimant's brief, were as follows:

"Prior to September 5, 1935, Fred Meintz was in good physical condition; he was a large, strong man, six feet three inches tall and weighed 270 to 280 pounds, solidly built and had never been sick. He was of a cheerful, jolly disposition, inclined to joke and talk. . . . After the second break the arm pained him terribly, and from then until March, 1937, it was very sore and would not heal; it pained him and pus was always coming from it. He had shooting pains up into his shoulder; his appetite was very poor. He was nervous, wanted to be left alone and he took aspirin, to relieve the pain. The arm would close over the draining sores, or sinuses, and heal a little bit, and then reopen right away. . . . This condition continued during the fall, and through the winter, the arm opening and closing. In fact from the time of the operation in November, 1935, until December, 1936, his condition was about the same. His weight had fallen off approximately fifty pounds after the

accident and it was still off in December, 1936, so that his clothing hung loosely upon him. In January, 1937, he had a cold and was off work and in bed a whole week. He was sick again in February and again in March; during those three months his arm was bothering him and open. He had shooting pains in his shoulder a week before the fifteenth of March. He had a terrific chill a week before March 15, the day he collapsed, and this was the time his arm was lanced by Dr. Lyttle, a few days after March 6. From the time of the operation until his death, his arm was intermittently sore and pained him. The elbow was purplish red and then it would open and a yellowish pus would be exuded. This would continue for a week or two and then the cycle would start again.''

Evidence on behalf of employer, however, tended to show a different condition than did claimant's testimony. This evidence was that at times Meintz acted as supervisor or foreman on certain projects but that at other times he drove and unloaded trucks with other employees; that he straightened out fenders, changed batteries, changed tires, tightened springs, repaired motors and loaded tires of approximately 100 pounds weight; and that he used both hands and both arms in a natural way in doing such work. There was also testimony that Meintz removed truck and gates weighing from 250 to 300 pounds; that he used a sledge hammer two hours at a time at least six times; that he used a wrench with both hands in changing the rear spring on a truck weighing 200 pounds; and that he did not make any complaint about his arm. There was also evidence that about a week before he last became ill, he moved a safe weighing 700 or 800 pounds with two other men; that they moved it out of the office on a two-wheeled truck; and that Meintz pushed the truck, using both hands equally.

It is apparent that the decisive fact issues herein were the character, extent, and effect of the infection in Meintz's elbow, and whether his last illness was septic pneumonia, caused by infection, or the more common type of lobar pneumonia contracted from germs. It must certainly also be apparent that, with the testimony above stated in the record, there was such a sharp and clear conflict on these issues that causal connection, between his arm injury and his death, cannot be determined as a matter of law. It is not difficult to understand why the Referee and the Commission would believe the statements of the doctors, who examined and treated Meintz (all of whom were witnesses called by claimant) over the lay testimony concerning the condition of his arm; and why they would also accept the unanimous opinion of all the doctors, who actually examined and treated him, over the opinion of doctors, who never saw him, as to the effect of such condition. We must hold that, conceding claimant made a prima facie case, this is not a case requiring a finding in her favor as a matter of law. We further hold that this is not such a case, as Adams v. Lilbourn Grain Co., 226 Mo. App. 1030,

48 S. W. (2d) 147, cited by claimant, where it could be said that the Commission's finding ''was so improbable, according to the ordinary operation of physical forces, or was so overwhelmingly disproved by credible witnesses, as to compel the conviction that . . . (it) either failed to weigh the evidence carefully, or draw unwarranted inferences, or yielded to a partisan bias.'' Instead, we find that the testimony of the doctors, who actually examined and treated Meintz, together with the employer's other testimony, was substantial evidence to support the Commission's finding against causal connection.

Claimant further argues that the infection in Meintz's arm, whatever its character and extent, necessarily weakened his condition so as to make him more susceptible to pneumonia germs and that it was therefore a contributing cause to his death. While it is no doubt true that any condition below perfect health might make it less difficult for a person to contract any disease, still every slight impairment of general physical condition would not necessarily be a *directly* contributing cause to death by such disease. At most, it would usually only leave the matter in the realm of speculation, conjecture and surmise. But even if it be conceded that claimant's evidence was sufficient to show such impairment of general vitality from the arm condition that it could be reasonably inferred to have been a directly contributing cause of Meintz's pneumonia, still it would not compel such a finding and the Commission's finding was that it was not such a cause. The rule in this situation is that stated in Doughton v. Marland Refining Company, supra: ''It is not sufficient for recovery to show that the injury or death complained of resulted from one or the other of two causes for one of which, but not the other, the defendant would be liable. The plaintiff must produce evidence from which it may reasonably be found that such injury or death resulted from the cause for which the defendant would be liable. If the evidence is such as to authorize a finding either way and the triers of the facts find against the plaintiff's claim, that finding is necessarily conclusive on appeal.''

Claimant further assigns error in limiting her examination of the doctors who testified. We find, however, that the questions to which objections were sustained were later again asked and were answered, so that the matters which claimant complains were kept out of the record, to her prejudice, were later allowed to come in for consideration. Therefore, this assignment is overruled.

Other assignments of error were abandoned by failure to mention them in claimant's points and authorities or argument. [Clay v. Owen, 338 Mo. 1061, 93 S. W. (2d) 914.] The judgment is affirmed. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.