Carl R. FORSHEY (Employee), Respondent,

v.

UNIVERSAL ATLAS CEMENT COMPANY (Employer and Self Insurer), Appellant.

No. 30403.

St. Louis Court of Appeals.

Missouri.

June 21, 1960.

Motion for Rehearing or for Transfer to Supreme Court Denied Sept. 6, 1960.

Ely & Hibbard, Ben Ely, Hannibal, for appellant.

William B. Spaun, White & Partee, Harrison White, Hannibal, for respondent.

ANDERSON, Judge.

This is a workmen's compensation proceeding filed by Carl R. Forshey against his employer, the Universal Atlas Cement Company, a corporation. The referee found that said employee did not sustain an accidental injury arising out of and in the course of his employment. On review the Industrial Commission affirmed the award of the referee, holding "we find from all the evidence that the condition of which the employee complains was not proven to have been the result of the accident of January 1, 1957, as alleged." On appeal the Circuit Court found that there was not sufficient competent evidence in the record to warrant the making of the final award of the Industrial Commission denying compensation, and remanded the case to the Commission for further proceedings. The Court's views were expressed in a memorandum filed in the case and which is as follows:

"In its final award denying compensation, the Industrial Commission apparently found that an accident occurred on January 1, 1957, as evidenced by its reference to 'the accident' of that date. If employee did sustain an accident within the meaning of the Act (and the Commission found either that he did or made no finding in that respect at all) then the weight of the evidence is contrary to the finding that claimant's condition (or conditions) did not, in part at least, result from such accident or that a pre-existing condition was not in some measure aggravated by the accident. Upon the finding that an accident occurred, the further finding that 'the condition of which the employee complains was not proven to have been the result' of that accident is against the overwhelming weight of the evidence.

"There was not sufficient competent evidence in the record to warrant the making of the final award denying compensation. The cause should be remanded to the Commission for further proceedings and the Commission directed to make specific and unequivocal findings as to whether there was an accident within the meaning of the Act and if so a determination of the amount of compensation to which employee is entitled."

That part of the judgment remanding this case reads as follows:

"It is therefore ordered that the cause be remanded to the Industrial Commission with directions to make specific findings that there was or was not an accident within the meaning of the Workmens Compensation Law and if it finds that there was an accident, the amount of compensation to which employee is entitled. Provided, however, if additional evidence is heard at such rehearing justifying a finding that no compensation is due employee nothing herein contained shall be construed as limiting the Commission's right to make such finding."

The employer has appealed from this judgment.

The scene of the occurrence which gave rise to this claim was a room in a kiln building owned and operated by appellant. In this room are 16 large kilns in which the limestone and shale, which are constituent elements of cement, are heated. Each kiln is equipped with a stack which is a large rectangular structure extending above the roof through which the fumes and smoke from the kiln escape. It is necessary periodically to clean out these stacks by a process known as "shooting the stacks." In each stack there is a door about four and one-half feet from the floor, and in the center of the stack a short rectangular post. A channel iron is inserted through the door in such manner that its further end is rested on this post.

The channel iron is about 12 feet in length and weighs, according to claimant's testimony, about 200 pounds. According to appellant's evidence its weight is 150 or 160 pounds. A cross section of the channel iron is like the letter U, so that there is a flange extending upward on each side as it is inserted into the stack. At the far end of the channel iron, which is resting on the central post, a charge of explosive powder is placed. This powder is detonated by electricity. The resulting explosion cleans the stack.

The channel iron is carried from one stack to another in the following manner. The front end, which becomes rather hot after an explosion, is rested at right angles on a piece of 2 x 4. This 2 x 4 is five or six feet in length. One employee carries each end of the 2 x 4. A third employee carries the rear end of the channel iron. The entire operation is under the supervision of a fourth employee known as a lead man. He walks ahead carrying the detonating equipment.

On the occasion in question claimant was carrying one end of the 2 x 4. Another employee named Riggs was carrying the other end, and an employee named Trower had hold of the rear end of the channel iron. The lead man was named Phillips. According to claimant's testimony he and Riggs while carrying the channel iron rested the 2 x 4 in the crook of their arms at the elbow, but according to the testimony of Riggs and Trower the 2 x 4 was being carried at arms length. The channel iron was being carried from stack No. 14 to stack No. 16, a distance of about 20 feet. In approaching stack No. 16 it was necessary for the men to pass underneath a large pipe known as a heat conveyor. This conveyor runs in a general horizontal direction but at the point where Riggs had to pass under it the pipe was 3½ feet from the floor and where claimant passed the pipe was 4 feet from the floor. Claimant testified that in stooping to go under the pipe his face would be 3 feet or less from the floor.

Claimant testified that in going under this pipe, "I must have went lower than Mr. Riggs because the channel iron slid down against me and I fell to my knees and dropped the 2 x 4 and throwed out my hands to catch myself." He further stated that the channel iron struck him above the hip, and indicated that it struck him in the lumbar region. He said that at the time he experienced severe pain in the lower part of his back, and he exclaimed "Boy, that got me." The channel iron dropped to the floor. Claimant further testified "I reached down for it again and either Riggs, or Trower, or Phillips, one of them said, 'just leave it lay there a little bit and get your wind back.'" Claimant said that he thought the sliding of the pipe did unbalance him and stated " * * * It all happened all at once down in under the pipe—and it all happened pretty fast. I don't know whether I slipped and (it) hit me or whether I slipped and dropped the end and let it fall against me or whether it fell against me and knocked me down, I don't know. It just happened all at once."

Riggs testified that the men stooped to go under the pipe and as they were coming out from under it claimant called out, "Hold it" and then put his end of the 2 x 4 down to the concrete floor and in doing so went down on one knee. Riggs lowered his side so the channel iron would not "scoot". Riggs then asked claimant "Can you make it all right?" and claimant replied "I think so" and gained his feet. The men then carried the channel iron to stack number 16 which was 8 or 10 feet from the conveyor pipe. Riggs testified that the channel iron did not fall, slide or strike claimant; that he did not see claimant fall; that the channel iron did not fall from claimant's hands; that claimant never told him he had fallen; that he never complained about hurting his back; that he never heard claimant say anything to Phillips, the lead man, about hurting his back, and that claimant did not say at the time "I think that got me."

Trower, who was carrying the back end of this channel iron, testified that he observed claimant go down on one knee, and put the 2 x 4 on the floor; that he did not hear claimant say anything at the time; that Riggs held on to his end of the 2 x 4 and let it down some; that he did not see the channel iron slide over and strike claimant; that he did not see claimant slip or fall; that claimant did not fall down on both knees and fall forward; that claimant got up and picked up the 2 x 4 and they went about their business; that claimant did not make any complaint to him or anybody else in his presence that he had hurt his back; that claimant made no complaint thereafter that day that he had had an accident or had hurt himself; that he never heard claimant say to Riggs "That got me"; that claimant did not do down on his knees suddenly; that it appeared to him that claimant got a little off balance and set the 2 x 4 down on the floor for an instant then picked it up and went on; that he did not hear claimant say anything to Riggs, and that Riggs did not assist claimant to his feet.

Phillips, the lead man, testified he did not see anything that happened when the other three men went under the conveyor pipe. However, he did testify that claimant made no complaint of having had an accident or having hurt his back. The occurrence in question which claimant characterizes as an accident took place about ten thirty A.M. Claimant continued to work the balance of the working day and performed all the duties required of him.

The foregoing events occurred on Tuesday, January 1, 1957. That day claimant changed shifts and did not have to report back to work until the swing shift on Friday, January 4th. In the meantime, according to his testimony, he suffered severe pain. During this period he consulted Dr. Canella, his personal physician, who gave him diathermic treatments. Claimant testified that when he returned to work Mr. Phillips told him to take it easy. Claimant continued on the job until January 9. Dur-

ing that time the pain he suffered continued to get worse. Ransdell was claimant's foreman. He testified he never heard about any alleged accident until January 9, 1957. He stated he had received orders to lay off four men as of that date and that claimant was one of them. Ransdell told claimant on January 9th that he had bad news for him, and advised him he was being laid off at the end of the week. Claimant replied that he had bad news for Ransdell and told the latter he had hurt his back while shooting the stacks. On January 11, 1957, claimant entered St. Elizabeth's Hospital in Hannibal. This was on the advice of Dr. Canella. While there a myelogram was performed and x-rays taken by Dr. Ellis who was the only doctor who attended claimant while he was in the hospital.

Neither Dr. Canella nor Dr. Ellis testified in the case. The records of St. Elizabeth's Hospital were not in evidence. However, in a report by Dr. Lucius C. Hollister, who subsequently examined claimant, there is a statement that the x-rays obtained from St. Elizabeth's Hospital revealed no definite evidence of protruded intervertebral disc. In a report of Dr. McCarroll, who also examined claimant, there is a statement that claimant was told the myelogram was negative. Claimant was discharged from St. Elizabeth's Hospital on January 27, 1957.

After claimant left the hospital he consulted a Dr. Murphy who advised him to see a specialist. Several specialists were suggested by Dr. Murphy, among whom was Dr. Lucius C. Hollister of Quincy, Illinois. Claimant consulted Dr. Hollister on February 25, 1957. Dr. Hollister took his history, which included previous back injuries which we will hereafter refer to in detail, and made a physical examination of claimant. The history taken recites that claimant stated he could do hard work standing up, but that stooping and sweeping with a broom bothered him; that he noticed more pain when he gets wet or cold; that coughing hurt his back; that sitting to have a bowel movement bothered him; that he had no difficulty with his back performing inter-

couse but would notice pain the following day and that tying his shoes hurt his back.

Dr. Hollister advised claimant to have a half-inch heel rise applied to his right shoe; to have a three-quarter inch plywood placed beneath his mattress and to apply moist heat to his back. Claimant was asked to return in one month for re-examination. Dr. Hollister's report, which was in evidence, recites that the patient returned March 11, 1957, stating his condition had been improved by the heel raise and the treatments previously recommended. Five days later the patient again stated his back was somewhat better. Dr. Hollister discussed the matter with claimant and advised he be examined by a neurosurgeon. Claimant testified that Dr. Hollister recommended a doctor in Iowa City, Iowa. The record indicates that the doctor recommended was Dr. Carroll B. Larson of Iowa City.

On August 7, 1957, the surgeon at the Veterans Hospital in Iowa City performed a laminectomy on claimant in which a degenerated intervertebral disc between L-4 and L-5 was removed and those vertebrae fused.

As a result of this operation claimant was advised by his doctor that he should refrain from heavy lifting, straining or anything of that sort.

It was the contention of the appellant employer that any disability from which claimant was suffering was solely caused by a back condition which arose many years prior to the events of January 1, 1957. It will therefore be necessary to review the evidence relating to said issue.

In April 1945 claimant was a member of the armed forces, but had been temporarily loaned to the plastics division of General Electric Company in Pittsfield, Massachusetts. While so employed he and another employee were lifting a large piece of metal when the other man dropped his end causing claimant's back to be jerked suddenly. Claimant suffered pain at the time. His foreman took him to the plant infirmary where he received treatment. The next day

he was treated by Dr. David Morrison who was an osteopath and medical doctor. The doctor's diagnosis was that he had suffered a bad sprain. The doctor taped claimant's body from his hips to his armpits. Claimant was off from work for three days as a result of this accident.

A few weeks later claimant had another accident at his home. He fell while going up stairs and suffered what he termed a bad sprain. He was treated by the Company doctor at the time, and was in the hospital 4 or 5 hours. X-rays of his back were taken but the record does not show what they revealed. Claimant stated that his whole back pained him, but the pain was mostly in the lower part. He was off work a week or longer. He did not recall experiencing pain in his legs at the time. He stated that when he went back to work he did not have pain. However, the Company doctor suggested he wear a sacroiliac belt which he did. He stated that this belt seemed to give him relief whenever he did have pain. Claimant then continued at his work until he was called back to active service in August 1945.

Claimant reported to Jefferson Barracks where he had a physical examination. He testified he thought he did say something to the examining doctors about having had a back injury. He believed they took x-rays. There was no evidence as to what these x-rays, if taken, showed. He stated he wore a sacroiliac belt part of the time he was at Jefferson Barracks. From Jefferson Barracks he was assigned to the Aberdeen Proving Grounds in Maryland where he resumed active duty as a machinist. Some of his work involved lifting heavy objects. He continued doing his regular work until February 10, 1946. On that date he was discharged from the army, after an examination by the army doctors, to whom he did not recall reporting any trouble with his back. He was very anxious to be discharged. He did not think the examination involved an x-ray of the back. There was no mention of any physical disability or infirmity noted on his discharge papers. Claimant testified that during the period of

his service he did not suffer any disabling effects from the accidents sustained while in the service except for the times previously mentioned.

After his separation from the service claimant returned to his home in Hannibal. He then worked for a time in a tavern and also drove a taxicab for a concern called One Five O. He started working for this firm in May, 1946, and worked off and on until the following December. His work with this company was not steady. On occasions he did not work at all. He stated he did not experience any disability in doing that work, but did wear a brace once or twice. He found that wearing a brace gave him support in driving. His next job was with a navy contractor on the island of Guam. Claimant testified that in qualifying for this job he was given a very strict physical examination. What this examination consisted of is not shown by the record. Claimant left for Guam in December of 1946 and returned to the States on March 11, 1947. Actually he was on the island of Guam slightly more than a month. He was supposed to stay there a year. He signed up as a machinist, but when he got to Guam he was classified as a mechanic and worked on such things as cranes and diesel generators. He stated he did not wear a sacroiliac belt while on Guam; that he did heavy lifting there and that during the time he was there he did not experience any disabling effect from his previous injury. The record does not reveal the reason for his short stay on Guam.

After his service on Guam claimant returned to Hannibal and secured a position tending bar in a tavern. He worked at this job for six weeks. During that time, according to his testimony, he did not wear a belt. He also stated that he experienced no trouble with his back while working in the tavern He also drove a taxicab in Hannibal for a short time after he returned from Guam. Thereafter claimant went to Quincy, Illinois, where he secured a position as taxicab driver for the Yellow Cab Company. He worked at this job for

five months. He then drove for another cab company. Claimant testified that he thought he did tell Mr. Badamo of the Yellow Cab Company that he was having trouble with his back, and that he sometimes wore a brace, but did not think he wore his brace while working for Mr. Badamo. Claimant stated he worked continuously while in Mr. Badamo's employ, and during said employment was not disabled in any way.

While in Quincy claimant worked as janitor for a church. He held this position for a period of almost two years. He stated that while so employed he performed his duties without interruption and without suffering any physical disability. He also stated that he talked to one of the church trustees about his physical condition, in which conversation his back was mentioned. While employed as a janitor at the church claimant also worked as a part time janitor at the Physicians and Surgeons Clinic in Quincy. He also had a pick-up truck and did hauling after finishing his work at the Church. During 1950 claimant filed a claim in Massachusetts for compensation under the Workmen's Compensation Act of Massachusetts, M.G.L.A. c. 152, § 1 et seq., for the injury received by him on April 4, 1945, while working for General Electric Company. In said claim the nature of the injury was alleged to be, "Sclerosis in the bone adjacent to right sacro-iliac joint, Intervertebrae disc rupture at the level of the 4th or 5th lumbar vertebrae disc."

After this claim was filed the Massachusetts Commission requested the Missouri Commission to take evidence in the case, and the matter was set for that purpose at Hannibal. Claimant did not appear at that hearing. He testified he didn't appear at the hearing because "I didn't think there was any use because I had been examined and they said there was no evidence of any back injury. * * * I was working and I didn't think it was worth while. * * * The Commission in Massachusetts found against me."

In 1948 claimant presented a claim to the Veterans Administration for compensation based on his back condition resulting from the General Electric accident. This claim was not allowed. Claimant testified: "I was sent to several doctors there. One of them was a Dr. Swanberg and he took a lot of x-rays, and I don't remember how many, and he said it showed no evidence of any back disorder." He further testified that none of the doctors ever told him at the time that he had disc trouble in the lower spine. Among the doctors who examined him at that time were Dr. Robin and Dr. Barber.

In August 1952 claimant went to work for the Hannibal Quincy Truck Lines in Hannibal as a freight hustler and truck driver. He stated that some of the articles he handled were heavy. He worked for this truck line until the latter part of May 1953. He testified that during the time he was employed by this company he worked continuously and was never at any time laid off on account of physical infirmity.

Claimant secured employment with Universal Atlas Cement Company June 2, 1953. At that time he was given a physical examination by Dr. Chilton, the company doctor. The examination was a general one and consisted of listening to the heart, taking blood pressure and asking questions about previous disease. Claimant did not tell the doctor about having trouble with his back. No x-rays of the back were taken.

Claimant went to work as a journeyman machinist. His duties consisted of general machine shop work. He continued on that job until December, 1956. Claimant stated that while so employed he worked steadily, and never lost any time from work by reason of physical infirmity. In December 1956, there was a reduction in force in the machine shop and claimant was transferred to the burner room. Shortly after he went to work there, according to witness Phillips, claimant told him (Phillips) that he had had a bad back ever since he was in the service

and had to wear a sacroiliac belt part of the time. Claimant's foreman Ransdell testified that sometime prior to January 1, 1957, claimant told him he had a bad back and wore a brace of some sort. Ransdell also testified that claimant made the statement that he liked the work, but thought maybe he might be laying down on the rest of the boys. Claimant denied making these statements.

On January 11, 1957, claimant, while in the hospital, gave the following signed statement to Albert Nichols, Supervisor of Industrial Relations of Appellant Company:

"On Tuesday, January 1, 1957, myself, Riggs and Trower were carrying the trough used for shooting stacks from No. 14 to No. 16 stack. Myself and Riggs were on the forward end, which we were holding up with a 2 x 4 board, and Trower was supporting the other end. As I bent to go beneath the boiler pipe, I felt a sharp pain and something give in my back. I could not straighten up and the weight of the channel iron forced me to my knees. I mentioned this to Phillips shortly afterward.

"My back bothered me quite a lot that evening so the next day, Wednesday January 2, 1957, I purchased a sacro-iliac belt at Musgrove's Drug store. I went to Dr. Canella on Thursday, January 3, Friday, January 4, Thursday, January 8, and Friday, January 9. He gave me heat treatments and a prescription. On Friday, January 9, Dr. Canella admitted me to St. Elizabeth's Hospital.

"While I was in the army during World War II, I was loaned out to General Electric Company. While at General Electric another fellow and myself were carrying a bar of steel. The other man dropped his end of the bar while we were carrying it and I received a back injury. I was examined at the plant infirmary and the doctor prescribed a sacro-iliac belt

which I wore for quite some time afterward. I have never had a back operation and I could not receive a pension as I was told the injury was not service-connected.

"I also had some trouble with my back in 1947 while driving a taxicab. I wore a sacro-iliac belt for a while at that time.

"Dr. Canella had been asking me for some time to come out to the hospital and have my back taken care of, but I did not want to lose time from work so I kept putting it off."

Claimant denied ever having said anything to Nichols to the effect that Dr. Canella had for some time been trying to get him to go to the hospital and have his back taken care of. He stated that it was after January 1, 1957, that Dr. Canella tried to get him to go to the hospital.

At the trial before the referee it was agreed by both parties that medical and hospital reports might be received in evidence without calling the doctors who had made them, and without qualifying the reports under the Business Records Act, Section 490.660 RSMo 1949, V.A.M.S. Under this agreement a copy of the records of the Veterans Hospital at Iowa City was introduced in evidence. This record starts with a history obtained from claimant. A part of this history is the statement that following the 1945 accident the patient had for 12 years intermittent bouts of increased distress in the lower back with radiation down the posterior right thigh. These various episodes were relieved by prolonged bed rest. The 1957 occurrence was then mentioned and it was stated that since that time the patient noted more frequent and more severe pains. After setting out a report of a physical examination it was stated:

"The patient demonstrated minimal signs of herniated intervertebral disk. Initially, it was decided to try him on a conservative course of exercises; however, after three weeks of physical therapy, he was still complaining of pain in the right lower back and down the right leg on minimal twisting or straining. It was decided in spite of the minimal findings, that the history was sufficient to warrant exploration of the lumbar spine at L-4. On August 7, 1957, a lumbar laminectomy was performed. A degenerated disk without herniation or rupture of the annulus was found at L-4 on the right side. Although the disk was bulging, the root at L-4 did not appear to be compromised to a great extent. The disk was removed on the right including more than half of its width across the canal and an amount of nucleus pulposus about the size of the distal joint of one's thumb was removed piecemeal. The patient appeared to tolerate the procedure well. One week after surgery, he received a week's course of physical therapy which consisted of progressive resistant exercises and hot packs. He had good muscle strength and full range of motion in his extremities and was discharged a symptomatic two weeks following surgery.

"Established Clinical Diagnoses: 1. Degenerative intervertebral disk, L-4, L-5, treated, improved (etiology unknown)."

On November 1, 1957, claimant was examined by Dr. Leonard Furlow, a neuro-surgeon. In his report there is the following conclusion. "His complaints are all subjective and I would estimate his percentage of disability as being not greater than 15 to 20%."

On November 29, 1957, at the request of appellant, claimant was examined by Dr. H. R. McCarroll, an orthopedic surgeon in St. Louis. In his report appears the following:

"Since the patient states that he had recovered from the symptoms * * * from the injury which was sustained on January 1, 1957, we must assume

that he sustained some additional injury to his back at that time. Whether this represented a recurrence of his original problem cannot be stated. It is possible, of course, that it may have resulted in an independent injury to his back. On the basis of his present findings I have nothing to suggest in the way of additional treatment except symptomatic measures as desired by the patient."

In a supplemental report Dr. McCarroll stated:

"Because of this patient's persistent symptoms, because of the surgery which was performed and because of the diminished reflexes in the left lower extremity at this time, I would estimate the residual disability to be approximately 25% of the individual as a whole."

There was no expert testimony to the effect that claimant's back condition was caused or aggravated by the alleged accident of January 1, 1957.

Upon this appeal the employer, Universal Atlas Cement Company, contends that the Circuit Court erred (1) in holding that there was no substantial evidence to sustain the finding of the Industrial Commission that "the condition of which the employee complains was not proven to have been the result of the accident of January 1, 1957, as alleged"; and (2) in remanding the case for a determination by the Commission as to whether an accident had occurred.

 In reviewing a compensation case there are certain principles which must be constantly borne in mind. Under Section 22, Article V of the Constitution V.A.M. S., it is the duty of the Court to determine whether the Commission's Award is supported by competent and substantial evidence upon the whole record. This is a duty imposed upon Circuit Courts as well as upon the Appellate Courts. But in performing this duty the reviewing court may not substitute its own judgment on the

evidence for that of the Commission. Its function is to decide whether the Commission could have reasonably made its findings upon a consideration of all the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence, Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55. In reaching its decision the reviewing court must view the record in a light most favorable to the findings of the Commission and consider all favorable inferences which the Commission had a right to draw from the evidence before it in support of its findings. Thacker v. Massman Const. Co., Mo.Sup., 247 S.W.2d 623; Francis v. Sam Miller Motors, Mo.Sup., 282 S.W.2d 5; Hall v. Spot Martin Inc. et al., Mo. Sup., 304 S.W.2d 844.

 In a workman's compensation case the burden is on the claimant employee to establish by the greater weight of the credible evidence that the disability complained of is the proximate result, in whole or in part, of the alleged accident. Meintz v. Arthur Morgan Trucking Co., Inc., 345 Mo. 251, 132 S.W.2d 1010.

We will first consider the contentions of Universal Atlas Cement Company that the Court erred in its finding that the Commission's Award was not supported by competent and substantial evidence, but was contrary to the overwhelming weight of the evidence.

We have heretofore stated at considerable length the evidence before the Commission, and it would serve no useful purpose to restate in detail the parts thereof which relate to the issue now under consideration. However, we will refer briefly to some of this evidence which throws light on the matter and which will aid in determining the question before us.

The condition which caused claimant's disability was a degenerated and partially protruding but not herniated disc between

L–4 and L–5, and the question before us is to determine whether or not the Industrial Commission could have reasonably found that this condition was not caused or aggravated by the alleged accident of January 1, 1957.

From the evidence it appears that in April 1945 claimant suffered an injury to his back which caused a great amount of pain in the lumbar region. A few weeks later he had another accident and suffered what he termed a bad back sprain. At that time his entire back pained him, but the pain was more severe in the lower part. At his doctor's suggestion claimant purchased and wore a sacroiliac belt which relieved him somewhat from the pain. At the time he was working at his usual trade of machinist. He was a member of the Armed Forces, but had been loaned to General Electric Company to work in its plant in Massachusetts. He was discharged from the army on February 10, 1946. After his discharge and prior to accepting employment with Universal Atlas Cement Company, claimant, except for a short period of time on the island of Guam, did not attempt to work at his usual trade, but did engage in various employments which required less physical strain and exertion than that required of a machinist. It is not shown why he left his employment in Guam after working for only about a month when his contract called for a year's service, but the inference might be drawn that he found he was, on account of his physical condition, incapable of doing the work required. In 1948 he presented a claim to the Veterans Administration for compensation based upon his back condition which resulted from the 1945 accident at the General Electric Company. In 1950 he filed a claim for compensation in Massachusetts against General Electric Company. In said claim the nature of the alleged injury was described as a rupture of the intervertebral disc at the level of the 4th and 5th lumbar vertebrae. After his return from Guam he told Mr. Badamo of the Yellow Cab Company that he was having trouble with his back and some times wore a brace. About this same time he talked to one of the trustees of the church where he worked as a janitor about his physical condition in which conversation his back was mentioned. He admitted that he wore a brace from time to time during the twelve year period after the 1945 accident. Shortly after he went to work for Universal Atlas Cement Company. Claimant told Phillips, that ever since he was in the armed services, he had a bad back and wore a belt part of the time. Sometime prior to January 1, 1957, claimant told his foreman, Ransdell, he had a bad back and wore a brace of some sort. He also told Ransdell he liked the work but thought he might be laying down on the rest of the boys. In a written statement given to Albert Nichols on January 11, 1957, claimant stated that Dr. Canella, his personal physician, had been asking him for some time to go to the hospital and have his back taken care of. The medical report of the doctors and the Veterans Adminstration contains a history obtained from claimant. In it is a statement that ever since the 1945 accident he had suffered from intermittent bouts of pain in the lower portion of his back and in the right leg. This history was taken at the time of claimant's operation in 1957. The history goes on to say that these episodes were alleviated after prolonged bed rest. Similar statements are contained in the reports of Dr. Hollister, Dr. Furlow and Dr. McCarroll. There was no medical testimony by any of the doctors who had examined or treated claimant that the latter's existing disability resulted from anything that occurred on January 1, 1957.

While plaintiff testified that after his alleged fall on January 1, 1957, he immediately complained about his back to the three men with whom he worked, each of these fellow workers denied that claimant made any such complaints. According to the testimony of his fellow workmen and Ransdell, the foreman, claimant continued to work all day January 1st without

complaining of his back. These same men also testified to facts from which an inference could be drawn that nothing unusual occurred on that day which would likely cause the injury of which claimant complained or aggravate any physical infirmity which he might have had. After January 1st claimant was off work for two days simply because he was changing shifts. When he returned he made no complaints whatever concerning his back. He worked until January 9th during which time he made no complaints. On that day Ransdell informed claimant that owing to a reduction in force he was going to be laid off along with three other men. After hearing this, claimant for the first time said he had sustained an accident January 1st, which had resulted in injury to his back.

■ From the foregoing evidence, although contradicted in many respects, the Commission, in our judgment, could reasonably have found that claimant's 1945 accident caused a condition in his back in which the disc was degenerated and slightly protruding; that this condition continued and caused recurrent episodes of pain, each one of which was relieved by rest and the wearing of a brace or belt, and that the disability suffered by claimant in January 1957 was simply another one of this series of episodes and was not the proximate result of the accident of January 1, 1957, which the Court inferentially found had occurred. The Commission could also have reasonably found that the back condition which claimant had was not aggravated in any way by said accident.

Our conclusion is that the Court erred in holding there was no substantial evidence to support the findings of the Industrial Commission, and in ruling that the said findings were contrary to the overwhelming weight of the evidence. It is therefore unnecessary for us to pass upon appellant's assignment that the court erred in remanding the case to the Industrial Commission.

The judgment is reversed and the cause remanded with directions to enter judgment affirming the Award of the Industrial Commission.

WOLFE, P. J., and RUDDY, J., concur.